[Civ. No. 17614. Fourth Dist., Div. Two. Sept. 7, 1978.]

THE PEOPLE EX REL. DEPARTMENT OF TRANSPORTATION, Plaintiff, v.
REDWOOD BASELINE, LTD., Defendant and Appellant;
BANK OF CALIFORNIA, as Successor Administrator With the Will Annexed, etc., et al., Defendants and Respondents.

664

## COUNSEL

Leo B. Newton for Defendant and Appellant.

Westover & Mack, Harry E. Westover, Barrick, Poole & Olson and Craig D. Lucas for Defendants and Respondents.

## OPINION

**KAUFMAN, Acting P. J.**—In this appeal we confront the problem of apportioning between a property owner and the holders of first and second deeds of trust encumbering the property a condemnation award resulting from the taking of a portion of the property. The trial court found the security of the trust deed holders impaired by the taking and apportioned the condemnation proceeds. Owner appeals contending the trial court's determination that the security of the trust deed holders was impaired was erroneous as a matter of law and that as owner it is entitled to the entire condemnation award.

The property involved is a rectangular parcel consisting of approximately 50.92 acres of unimproved land north of Baseline Avenue near Etiwanda in the County of San Bernardino. On August 15, 1974, the state through the Department of Transportation commenced an eminent domain proceeding to acquire fee ownership of 6.1 acres of the larger parcel for flood control purposes. The part taken cuts diagonally across the larger parcel, effectively dividing it in half. The northern portion of the remainder, consisting of approximately 22.5 acres, was left land-locked.

Pursuant to then Code of Civil Procedure section 1246.1,[1] now sections 1260.220 and 1268.710,[2] the condemnation proceeding was bifurcated, the total amount of the condemnation award to be determined first by jury trial and the amount to be allocated to each of the several interests to be determined thereafter by trial to the court. The jury fixed the total award at $81,600: $36,600 for the 6.1 acres taken and $45,000 severance damages to the 22.5-acre landlocked portion of the remainder.

The apportionment phase of the trial may best be characterized as a discussion of the respective claims of the parties. Although there were several offers to stipulate to a number of facts, virtually none of the offered stipulations was unequivocally accepted by all parties, and just what facts were stipulated is now a matter of dispute. However, although the record is not entirely satisfactory, a number of facts appear to be uncontroverted.

In 1967 the property was owned by Charles R. Latimer and his spouse. In December 1967 the Latimers sold the property to Mr. and Mrs. Goldsworthy, Mr. and Mrs. Mueller and William H. Burkhalter, Jr. (hereafter the Goldsworthy group) for $163,800. The Goldsworthy group paid $25,000 down. For the balance of the purchase price they gave their promissory note in the amount of $138,800 secured by a first deed of trust on the property. The note provided its principal sum was due on or before January 1, 1983. Interest at 7 percent per annum was payable semiannually until the principal sum was paid. This note and deed of trust are now held by Bank of California as successor administrator with the will annexed of the estate of Charles R. Latimer.

In December 1971 the Goldsworthy group sold the property to the present owner Redwood Baseline Ltd., a limited partnership. The sales price was $205,000. $138,800 was represented by the lien of the first trust deed and approximately $2,700 was paid in cash. The balance of the purchase price was represented by a promissory note for $63,558 secured by a second deed of trust on the property. The note called for quarterly

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] In 1975 the statutory condemnation law was substantially revised by enactment of the Eminent Domain Law. (Stats. 1975, ch. 1275, § 2, p. 3409.) The operative date of the revised law was July 1, 1976. However, it was made expressly inapplicable to eminent domain proceedings commenced prior to January 1, 1976. (§ 1230.065 [Stats. 1975, ch. 1275, § 2, p. 3410].) Inasmuch as the instant proceeding was commenced in August 1974, the law applicable to it is that preexisting the 1975 revision.

payments of interest only at 7 percent per annum until April 1, 1977, at which time regular principal and interest payments were to commence.

In April 1976 Redwood Baseline (hereafter owner) petitioned the court to withdraw from a deposit by the condemner of $40,900 the sum of $10,500 for payment of due and past due real property taxes on the property and interest payments due under the first and second trust deed notes. The application was granted and $10,500 was paid over to owner for these purposes, but neither the taxes nor interest was paid. By the time the apportionment phase of the trial was concluded $1,112.27 in interest was due the holder of the second trust deed note and $14,869.30 was due the holder of the first trust deed note including $4,446.31 in delinquent taxes and $425 in foreclosure costs incurred in connection with a foreclosure proceeding instituted while this litigation was pending.

On September 16, 1976, the court issued its intended decision. It found the security of the deeds of trust impaired by the taking "in the same ratios as the 6.1 [acres] bears to the total acreage . . . (less the portions in streets and the pre-existing flood control amount)." Further it found the security of both trust deeds combined impaired by an amount equal to one-third of the severance damages but it concluded that since amounts paid on principal of the first trust deed note would improve the security position of the second, all severance damages allocable to the trust deed holders should be paid to the holder of the first deed of trust. It found further that, since the trust deed notes provided for payment of interest only, the security of the holders "has been further impaired by the amounts of the existing default under the notes and trust deeds resulting from the failure to make payments of interest and real estate taxes and foreclosure charges . . . ." Accordingly, the court indicated it would allocate $8,667.27 to the holder of the second deed of trust ($7,555 referable to the 6.1 acres taken and $1,112.27 for delinquent interest payments) and $46,804.30 to the holder of the first deed of trust ($16,935 referable to the 6.1 acres taken, $15,000 referable to severance damages and $14,869.30 on account of delinquent taxes, past due interest and foreclosure charges). The balance of the condemnation award, $26,128.33, was to be allocated to owner. In due course judgment was entered in accordance with the intended decision. Findings of fact and conclusions of law were requested and made but have not been included in the record on appeal.

Owner's primary contention is that the value of the property after the take exceeded the amount of the indebtedness secured by the deeds of trust and that, therefore, the trust deed holders' security was not impaired and they are entitled to no part of the condemnation award.[3] Owner asserts that California case law establishes that, notwithstanding the taking of a substantial portion of the property constituting the security, if the value of the remaining property is equal to or exceeds the amount of the secured indebtedness, there has been no impairment of the security. (This asserted rule will hereafter be referred to as the debt equivalency rule.) Should that be incorrect, owner urges secondarily that the value of the remaining property is sufficiently in excess of the secured indebtedness to provide the trust deed holders the margin of security in excess of the amount of the debts existing at the time the trust deeds came into being (i.e., $25,000 as to the first trust deed and $2,700 as to the second) and that, therefore, as a matter of law, the security of the trust deed holders has not been impaired. (This asserted rule will hereafter be referred to as the original ratio rule.)

Trust deed holders contend the question of what constitutes an impairment of security authorizing or requiring apportionment between the owner and trust deed holder of an award in condemnation resulting from a partial taking has not been definitively decided in California and, indeed, is not well settled in other jurisdictions. They contend the debt equivalency rule is entirely unfair to the lienholder and is inconsistent with the bargain and reasonable expectations of the parties. They urge that generally the holder of a deed of trust or mortgage is entitled to a reasonable margin of security over and above the amount of the secured indebtedness; that where, as here, the security to debt ratio existing just prior to the taking provided a reasonable margin of security over and above the amount of the secured indebtedness,[4] the reduction in that reasonable margin caused by the taking constitutes an impairment of security and an apportionment of the condemnation award to restore the pretake security to debt ratio is appropriate. (This asserted rule will hereafter be referred to as the pretake ratio rule.) In any event, trust deed

---

[3]Owner does not specifically attack the allocation to the trust deed holders of the amounts for delinquent taxes, past due interest payments and foreclosure charges and it is unclear whether it contests the propriety of that portion of the judgment.

[4]At trial Bank of California offered to prove it is the practice of commercial lenders making first trust deed loans on unimproved land such as is here involved to loan no more than 35 to 50 percent of the appraised value of the property. This offer of proof was rejected by the court as irrelevant since the trust deeds here involved were not created as a result of commercial loan transactions but rather represented the unpaid balance of the purchase price in sales transactions.

holders contest owner's factual assertions and contend owner has failed to demonstrate reversible error on the part of the trial court.

We have concluded that the question of what constitutes an impairment of security in this context has not been definitively decided in California; that there is authority for each of the rules suggested by the parties and, indeed, several others; that while each of these rules may be appropriate, helpful or even decisive in certain circumstances, no one of these rules may be appropriately applied to produce a fair result in all cases; and that, accordingly, the question whether the security of a deed of trust has been impaired by a partial taking should be treated as a question of fact to be determined in light of the particular circumstances of each case after a consideration of all of the relevant factors. Finally, we conclude that owner has failed to demonstrate any reversible error in the apportionment made by the court in the case at bench.

The trust deeds here involved contain the usual provision that any award of damages in connection with a condemnation of the property or any part thereof shall be paid to the trust deed holder who may at his option apply the amount received upon the secured indebtedness or release it to the owner. However, trust deed holders chose not to assert any right they might have to the condemnation award under this trust deed provision. Accordingly, except for a caveat in connection with the reasonable expectations of the parties (see fn. 13, *infra*) we disregard it.

Although a different rule obtains in some jurisdictions,[5] it is well settled in California that in the absence of an agreement between the parties to the contrary, a trust deed holder or mortgagee[6] is entitled to

---

[5]In a number of jurisdictions the lienholder is held entitled to all of the condemnation award up to the amount of the secured indebtedness. (E.g., *City of Chicago* v. *Salinger* (1943) 384 Ill. 515 [52 N.E.2d 184, 154 A.L.R. 1104]; see *Buell Rlty. Note Col. Tr.* v. *Central Oak Invest. Co.* (Tex.Civ.App. 1972) 483 S.W.2d 24, 26; Teague, *Condemnation of Mortgaged Property* (1966) 44 Texas L.Rev. 1535, 1539-1540 [cited hereafter as Teague]; Leipziger, *The Mortgagee's Remedies for Waste* (1976) 64 Cal.L.Rev. 1086, 1100 [hereafter cited as Leipziger]; 1 Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953) § 115, pp. 490-491 [hereafter cited as 1 Orgel]; 4 Nichols on Eminent Domain (3d ed. 1977) § 12.43, pp. 12-847 - 12-848.) Several commentators classify this as the majority rule. (Teague, *supra*; Leipziger, *supra*.) Other sources indicate the impairment of security rule is the majority rule. (See Annots. 58 A.L.R. 1534, 1539; 110 A.L.R. 542; but cf. Annot. 154 A.L.R. 1110, 1113.)

[6]So far as is here pertinent the California law makes no distinction between a deed of trust and a mortgage with power of sale. (Cf. *Cornelison* v. *Kornbluth*, 15 Cal.3d 590, 599

share in an award resulting from condemnation of part of the property constituting the security only to the extent the security has been impaired by the taking.[7] (*Milstein* v. *Security Pac. Nat. Bank, supra,* 27 Cal.App.3d at p. 486; *Sacramento etc. Drainage Dist.* v. *Truslow, supra,* 125 Cal.App.2d at p. 499; see *Pomona College* v. *Dunn,* 7 Cal.App.2d 227, 232 [46 P.2d 270]; *Los Angeles T. & S. Bk.* v. *Bortenstein, supra,* 47 Cal.App. at pp. 423-424; *Reed Orchard Co.* v. *Superior Court,* 19 Cal.App. 648,

---

[125 Cal.Rptr. 557, 542 P.2d 981]; *Bank of Italy etc. Assn.* v. *Bentley,* 217 Cal. 644, 657 [20 P.2d 942]; *Woody* v. *Lytton Savings & Loan Assn.,* 229 Cal.App.2d 641, 645, fn. 1 [40 Cal.Rptr. 560].)

[7]In 1975 this rule was codified in the enactment of the Eminent Domain Law (Stats. 1975, ch. 1275, § 2, p. 3455) and is now embodied in Code of Civil Procedure section 1265.225. As previously noted, however, the statute enacted in 1975, although operative July 1, 1976, is inapplicable to eminent domain proceedings commenced prior to January 1. 1976. (§ 1230.065 [see fn. 2, *ante*].)

The Law Revision Commission comment to section 1265.225 states that the section "codifies the case law principle that a lienholder is entitled to share in the award only to the extent of the impairment of his security *notwithstanding any agreement to the contrary entered into at the time of the creation of the indebtedness* on which the lien is based." (Italics added.) As illustrative of that principle the comment cites *Milstein* v. *Security Pac. Nat. Bank,* 27 Cal.App.3d 482 [103 Cal.Rptr. 16], and *Sacramento etc. Drainage Dist.* v. *Truslow,* 125 Cal.App.2d 478 [270 P.2d 928, 271 P.2d 930]. Although it is probably now of only academic interest, we are constrained to observe that neither *Milstein* nor *Truslow* purported to hold agreements between owners and lienholders for the disposition of condemnation proceeds made contemporaneously with creation of the secured debt generally invalid or unenforceable. *Truslow* neither involved nor discussed any such agreement. *Milstein* held only that in a situation where the partial taking necessitated repair and reconstruction of a structure for which the condemnation proceeds were needed, the several trust deed provisions requiring the owner to repair the property and giving the lienholder the option of receiving the condemnation proceeds and applying them upon the debt or paying them over to the owner created a conflict and ambiguity and that in those circumstances the implied in law obligation of good faith and fair dealing required the lienholder to elect to turn the proceeds over to the owner for use in the repair and reconstruction. (27 Cal.App.3d at pp. 486-487.) The *Milstein* court did not hold nor, in view of its facts, could it hold that a trust deed provision giving the lienholder the option of receiving any condemnation award and applying it upon the debt is generally unenforceable or invalid. Neither are we aware of any other California case so holding.

Numerous California cases dealing with the right of a lienholder to recover damages for injury to the property constituting the security caused by acts of waste by the owner or his privies or tortious conduct on the part of third persons state the applicable rule in the same language: the lienholder may recover damages only for the impairment of the security. (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at pp. 598, 603, 606; *Easton* v. *Ash,* 18 Cal.2d 530, 539 [116 P.2d 433]; *Miller* v. *Waddingham,* 91 Cal. 377, 381-382 [27 P. 750]; *Lavenson* v. *Standard Soap Co.,* 80 Cal. 245, 246-249 [22 P. 184]; *Buckout* v. *Swift,* 27 Cal. 433, 436; *Robinson* v. *Russell,* 24 Cal. 467, 473; *U.S. Financial* v. *Sullivan,* 37 Cal.App.3d 5, 13 [112 Cal.Rptr. 18]; *Los Angeles T. & S. Bk.* v. *Bortenstein,* 47 Cal.App. 421, 423-424 [190 P. 850]; see also *American Sav. & Loan Assn.* v. *Leeds,* 68 Cal.2d 611, 614, fn. 2 [68 Cal.Rptr. 453, 440 P.2d 933].) The propriety of applying language found in such cases to the problem at hand is discussed *infra*.

665-666 [128 P. 9, 18]; cf. *Gutleben v. Crossley*, 13 Cal.App.2d 249, 252-254 [56 P.2d 954]; but cf. *City of Vallejo v. Superior Court*, 199 Cal. 408, 417-418 [249 P. 1084, 48 A.L.R. 610]; *Rose v. Conlin*, 52 Cal.App. 225, 230-232 [198 P. 653]; *Stratford Irr. Dist. v. Empire Water Co.*, 58 Cal.App.2d 616, 623-624 [137 P.2d 867].) ▮ The crucial question, however, is what is meant by impairment of the security.

Owner contends the cases establish that impairment of security means reduction of the value of the property constituting the security below the amount of the debt secured (the debt equivalency rule). The cases relied on are *Los Angeles T. & S. Bk. v. Bortenstein, supra*, 47 Cal.App. 421, *Pomona College v. Dunn, supra*, 7 Cal.App.2d 227, *Sacramento etc. Drainage Dist. v. Truslow, supra*, 125 Cal.App.2d 478, and *Milstein v. Security Pac. Nat. Bank, supra*, 27 Cal.App.3d 482. None of the cited cases holds or, except perhaps in respect to one special situation, even indicates that impairment of security means what owner suggests.

▮ In *Bortenstein* mortgaged improved real property was greatly damaged by a flood. The owner sued the City of Los Angeles alleging the flood damage was caused by the city's tortious conduct. The owner recovered judgment against the city. Before the city paid the judgment, however, the mortgagee commenced a foreclosure action naming the city as an additional defendant and claiming a lien against the amount recovered by the owner from city to the extent it represented damages to the mortgaged property. The foreclosure decree directed a sale of the mortgaged property and granted the mortgagee a lien on the damage award to satisfy any "deficiency" which should remain after application of the net proceeds of sale upon the debt. Relying on the doctrine of equitable conversion, the reviewing court affirmed the foreclosure decree. The court held the damage award took the place of and was substituted for the portion of the property destroyed or damaged and was subject to an equitable lien in favor of the mortgagee. It stated in part: "If, by condemnation proceedings, the city had appropriated any part of the mortgaged property, . . . [a]s a mortgagee, plaintiff could have claimed so much of such damages as might be necessary to satisfy the indebtedness secured by the mortgage, if the part of the mortgaged property not taken or damaged by the city should prove insufficient for that purpose." (47 Cal.App. at p. 423.) Although the court spoke of "the reduced value of the land" (47 Cal.App. at p. 424), it did not mention much less explain impairment of security. It is true, of course, that if it turned out at the foreclosure sale that the value of the remaining mortgaged property was equal to the amount of the debt (plus costs of sale), the mortgagee would

then be entitled to no part of the damage award. But so saying merely states a truism—ultimately the lienholder is entitled to payment of no more than the amount of the debt. It does not follow, however, that the lienholder is not entitled to a margin of security over and above the amount of the debt if the lien on the property constituting the security is to continue in force after disbursement of the damage or condemnation award. The significance of the *Bortenstein* case to resolution of the problem at hand lies in the fact that the mortgage was being foreclosed prior to disbursement of the damage award so that the debt would be satisfied and the lien extinguished prior to the owner's receiving any part of the damage award. The case is illustrative of the fact that where the circumstances are such that the security has been or is immediately to be applied to satisfaction of the debt (e.g., foreclosure has occurred or is in progress) so that the security transaction is at an end and will not continue after distribution of the condemnation award, if the value of the security is equal to or in excess of the amount of the secured debt, its application to the debt will extinguish the debt, and nothing more is required to fully protect the lienholder. It also illustrates that where foreclosure proceedings are under way but it has not yet been ascertained whether the value of the security is sufficient to satisfy the debt, it is appropriate to protect the lienholder until that fact has been ascertained by imposing a lien or trust on the award for satisfaction of any deficiency between the value of the security and the unpaid amount of the debt (plus costs).

In *Pomona College* v. *Dunn,* as in *Bortenstein,* the mortgagee foreclosed and sought a lien against a condemnation award resulting from a partial taking of the property constituting the security. The trial court granted the lien. On appeal that part of the judgment was reversed because the mortgagee had been a party to the condemnation action in which the court specifically determined the security of the mortgage had not been impaired by the taking and the mortgagee was bound by that determination by res judicata. Thus the impairment of security rule was involved in the case, but the case sheds no light on the meaning of impairment of security. The only facts disclosed were that the original debt was $10,000, that the taking was partial, that the value of the portion taken was $5,568 and that there were no severance damages. The size of the property, the size of the portion taken, the value of the property before the taking and the value of the property remaining after the taking are not disclosed. So far as can be told from the case, the value of the remaining property may have been many times that of the unpaid amount of the indebtedness.

We have previously mentioned the holding in *Milstein*. (See fn. 7, *ante*.) In that case improved commercial property constituted the security under a deed of trust for an indebtedness of some $32,000. The portion of the property taken by condemnation was a 10-foot strip which required the removal of the front of a building on the property. During the course of the eminent domain proceeding, the owner moved to withdraw the $38,075 deposited in court by the condemner for the purpose of repairing and restoring the building as necessitated by the taking. After a hearing the court found the security of the deed of trust had not been impaired by the taking and ordered, first, $18,000 and, subsequently, the balance of the deposit paid over to the owner. Ultimately, the award in condemnation was fixed at $43,000, $5,915 more than the original deposit. On the trust deed holder's motion for an order of apportionment, the trial court ruled the owner was entitled to all of the condemnation award. On appeal, the trust deed holder asserted the right to all of the award up to the unpaid balance of the secured indebtedness under a provision contained in the deed of trust. The reviewing court found the provisions of the deed of trust conflicting and ambiguous and held that under the circumstances, the implied in law covenant of good faith and fair dealing required the trust deed holder to elect to turn over the condemnation proceeds to the owner for repair and restoration of the building damaged by the taking. The court did state the impairment of security rule (27 Cal.App.3d at p. 486) and observed that the trust deed holder "presented no evidence that its security had been impaired or that it had been damaged by the taking." (27 Cal.App.3d at p. 485.) However, the decision sheds no light at all on what is meant by impairment of the security. The opinion does not disclose the value of the property before or after the take, nor is there any indication whether the award included any severance damages. One might well speculate that, inasmuch as all but $5,915 of the award was released for use in repairing and restoring the building damaged by the taking and, presumably, went back into improvement of the property, there was little if any diminution in the value of the property constituting the security. The value of commercial property is principally a function of its use and would in many cases be almost unaffected by the taking of a 10-foot strip if after the taking any structural damage was repaired and the property thereafter continued to be used for the same purposes as before. In any event, the decision is not helpful in resolving the question confronting us.

In *Truslow*, a drainage district sought to condemn an easement in land which constituted security for unmatured assessment bonds of a reclama-

tion district. The value of the easement condemned was fixed at $50,000 and the reclamation district on behalf of the bondholders sought to impose a trust on the condemnation proceeds for payment of interest and principal on the bonds. However, the trial court found that the construction of the improvement for which the easement was taken (a new channel and training levees) enhanced the value of the property constituting the security by at least $50,000 and concluded that the security of the bondholders had not been diminished. Accordingly, no part of the condemnation award was set aside for the bondholders. On appeal the judgment was affirmed. Not only did the court not equate impairment of security with a reduction in value below the amount of the debt, the language it employed suggests it equated impairment of security with diminution in the value of the property constituting the security. It said: "there had been no lessening of the security underlying the bonds" (125 Cal.App.2d at p. 483); "the bondholders had suffered no diminution in the value of their security, and . . . although the security underlying the bonds had been cut down as to quantity of land by reason of the rights condemned, the improvement in the quality of the remaining land more than offset and more than compensated the loss in quantity" (125 Cal.App.2d at p. 494); "the security of the assessment liens on the parcels involved had been in no wise diminished" (125 Cal.App.2d at p. 499). However, the court was not attempting to define impairment of security and probably its language is attributable simply to the facts of the case. ■ *Truslow* does instruct us that, generally, there can be no impairment of the security, unless the value of the property constituting the security has been diminished by the partial condemnation.

Although the cited cases do not support owner's contention that the correct rule is the debt equivalency rule, authority for that proposition is found in *Swanson* v. *United States* (9th Cir. 1946) 156 F.2d 442, *Mahoning Nat. Bank* v. *City of Youngstown* (1944) 143 Ohio St. 523 [56 N.E.2d 218], *Fidelity-Philadelphia Trust Co.* v. *Kraus* (1937) 325 Pa. 581 [190 A. 874, 110 A.L.R. 538], and, most importantly to us as an intermediate California appellate court, *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590. ■ Significantly, in each of these cases the lienholder had foreclosed or was in the process of foreclosing the lien, and, as we have previously observed in discussing the *Bortenstein* case, where foreclosure has already occurred or is underway so that the security transaction is at an end all that is required to protect the lienholder is that the value of the security be equal to the debt since the value of the property has already been or is to be applied upon the debt immediately.

In *Swanson* the mortgagees foreclosed prior to the time of the taking in eminent domain. At the foreclosure sale the mortgagees purchased the property, bidding in the full amount of the debt. They then sought also to recover the eminent domain award and were successful in the trial court. The reviewing court in effect reversed the judgment, remanding the case to the trial court for a finding on the value of the security after the partial condemnation. Said the court: "The mortgagees here chose to have their debt satisfied by taking title to the non-condemned portion of the land and also the entire award for the condemned portion, but as it will be seen by the foregoing the demand on the fund may be allowed only to the extent of the difference between the value of the non-condemned portion and the value of the interest they held under the mortgage. ▮ ▮▮▮▮ If the non-condemned portion of the whole tract purchased by them by surrendering their mortgage claim at the foreclosure is of the value of their mortgage lien they have no claim upon the fund."[8] (156 F.2d at p. 449.)

In the *Kraus* case the city changed the grade of a street adjoining the mortgaged property ultimately resulting in a $6,000 damage award to the owner. However, before the assessment of damages had been completed, the mortgagee foreclosed and purchased the property constituting the security for a nominal amount. Thereafter, prior to payment of the damage award to the owner, the mortgagee instituted suit to impose a constructive trust on the damage award. The mortgagee's suit was dismissed and it appealed. On appeal the judgment was affirmed. The court reasoned: "If, before foreclosure, the plaintiff had intervened in the land damage proceeding it would have been entitled to receive the amount awarded (though not more than the debt secured) regardless of whether the mortgaged land was then worth more or less than the debt, and the landowner would have suffered no injury of which he could complain, because the amount so received by his creditor would have been credited on his general obligation; but the plaintiff, by foreclosing and taking the property, brought before the court a different relationship to be considered. If the mortgaged property was damaged by the change of grade so that it was worth less than the debt secured, plaintiff still had a claim against the landowner enforceable in equity against the land

---

[8]In California when the lienholder forecloses and bids in the entire unpaid amount of the indebtedness the lien is extinguished and the lienholder is not entitled to any part of a fund of money resulting from injury to the property. (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at pp. 606-607; *Duarte* v. *Lake Gregory Land and Water Co.,* 39 Cal.App.3d 101, 105 [113 Cal.Rptr. 893]; *Schumacher* v. *Gaines,* 18 Cal.App.3d 994 [96 Cal.Rptr. 223].)

damages awarded but unpaid and a bill to construct a trust would be an appropriate remedy. But before equity will decree that the [damages awarded] be held by [defendant] in trust for the benefit of the plaintiff, the plaintiff must show an equitable right to support the decree . . . . Coming into court with no mortgage lien, and after having taken the property, the plaintiff must do equity by showing and allowing credit for the value of what has been received; plaintiff must satisfy the chancellor that it has sustained a loss to be compensated by the trust sought to be established. . . . As there is no evidence that the value of the land acquired was less than the debt, the bill was properly dismissed." (190 A. at p. 876.)

In the *Mahoning National Bank* case the mortgaged property had been damaged by the city as the result of a grade elimination project. The mortgage was then in default and subsequently was foreclosed. The proceeds of the foreclosure sale were applied to the debt, leaving an unpaid balance. The mortgagee then sought to recover from the city a portion of the damage award in its hands sufficient to satisfy the unpaid balance of the debt. On appeal, judgment in favor of the mortgagee was affirmed. In discussing the mortgagee's rights the court quoted extensively from American Jurisprudence. Following the indication of a textual omission the quote concludes: " 'If the mortgagee seeks in equity to follow the damages awarded, he must show that the property was so damaged as to be worth less than the debt secured.' " (56 N.E.2d at p. 224.) ▇▇ The portion of the American Jurisprudence text omitted by the *Mahoning National Bank* court is significant in evaluating the quoted requirement that the mortgagee " 'must show that the property was so damaged as to be worth less than the debt secured.' " It reads: "*But where the mortgagee forecloses his mortgage, the sale discharges the lien* of the mortgage, and the right to damages does not pass to the mortgagee by the sale, since such right is personal, and does not run with the land. *It follows* that if the mortgagee seeks in equity to follow the damages awarded, he must show that the property was so damaged as to be worth less than the debt secured. [Fn. omitted.]" (18 Am.Jur. § 235, p. 869 [now 27 Am.Jur.2d, § 257, pp. 37-38].) (Italics added.) The omitted footnote cites *Fidelity-Philadelphia Trust Co.* v. *Kraus, supra,* 190 A. 874 [110 A.L.R. 538].)

▇▇ These cases confirm our observation that whether the security transaction is to continue in force or has been or is to be immediately terminated is a factor crucial to the propriety of applying the debt

equivalency rule. *Cornelison v. Kornbluth, supra,* 15 Cal.3d 590, is consistent with this thesis. .

*Cornelison* involved a statutory action for waste (Civ. Code, § 2929[9]) against the successor in interest of the owner-trustor for his alleged failure properly to care for and maintain the property (a single family dwelling) constituting the security under a deed of trust given to secure the balance of the purchase price of a sale of the property. The house was declared unfit for human habitation, and the debt was in default. The trust deed holder, who was the original seller of the property, instituted statutory proceedings and caused the property to be sold at a trustee's sale at which the trust deed holder purchased the property, bidding in the full amount of the balance of the debt plus foreclosure costs. Although the court held that the full credit bid extinguished the lien and precluded any recovery by the lienholder of damages for waste (15 Cal.3d at pp. 606-608), the court discussed at some length the right of a lienholder to recover damages for waste and the effect upon such right of California anti-deficiency legislation. The court concluded that the antideficiency legislation precluded the trust deed holder from recovering damages for any but "bad faith" waste (15 Cal.3d at p. 606), but in discussing these problems the court observed that a lienholder can recover damages for waste only to the extent of the impairment of the security (15 Cal.3d at pp. 602-603) and, interpreting language found in *Robinson v. Russell, supra,* 24 Cal. at page 473,[10] the court stated: "[T]he measure of damages for waste is the amount of the impairment of the security, that is the

---

[9]Civil Code section 2929 reads: "No person whose interest is subject to the lien of a mortgage may do any act which will *substantially impair the mortgagee's security."* (Italics added.)

[10]"There can be no doubt but that an action can be maintained by the mortgagee for ·injuries of the character set forth in the complaint in this case, when it appears that by the acts complained of the mortgage security is impaired. . . . There can be as little doubt that the mortgagee may, by injunction, stay the commission of waste upon the mortgaged premises, when he makes a proper case in equity and shows that the commission of the threatened acts will *materially impair the value of the property subject to the lien so as to render it an inadequate security for the mortgaged debt."* (*Robinson v. Russell, supra,* 24 Cal. at p. 473.) (Italics added.)

As can be seen from the quoted language, the court in *Robinson v. Russell* did not itself say in so many words that the plaintiff was required to show the injury to the mortgaged property had reduced its value to less than the amount of the debt. It spoke of impairing the value of the property so as to render it an "inadequate security" for the debt. There appear in the opinion no facts or figures indicating the court equated "inadequate security" with value less than the amount of the debt. As shall hereafter appear, where the lien has not been foreclosed and the debtor-creditor relationship is ongoing, the security may become "inadequate," long before its value is reduced to less than that of the amount of the debt. *Robinson v. Russell* is entirely consistent with that thesis. The later case of *Lavenson v. Standard Soap Co., supra,* 80 Cal. 245, contains language and figures

amount by which the value of the security is less than the outstanding indebtedness and is thereby rendered inadequate." (15 Cal.3d at p. 606; see also pp. 602-603.)

We do not believe we are required by *Cornelison* to apply the definition of impairment of security there articulated to the problem we confront in the case at bench. In the first place, just as in all of the cited condemnation cases applying the debt equivalency rule, in *Cornelison* the trust deed had been foreclosed, the security transaction was at an end and the definition of impairment of security in terms of security value less

which would appear to indicate the court may not have equated impairment of security with value less than the amount of the debt. There the property had been sold for $25,000. $10,000 was paid in cash and a promissory note for the balance of $15,000 secured by a mortgage was given for the balance. Having foreclosed and obtained a deficiency judgment, the mortgagee instituted an action against the mortgagor and one or more third parties for damages for the removal of certain fixtures from the property. In affirming judgment for the plaintiff the court said in relevant part: "These articles at the time of their removal were of the aggregate value of $4,950, to which extent plaintiff's mortgage security was permanently decreased by such removal. Both defendants knew at the time of the removal that the articles were subject to the mortgage lien, and that the removal of them would impair and render insufficient the mortgage security of plaintiff, which prior and up to the time of the removal was of the value of twenty-five thousand dollars." (80 Cal. at p. 249.) If the value of the property was $25,000 prior to the removal of the fixtures which were worth $4,950, it would appear the property was then worth $20,050 whereas the debt was originally $15,000. Thus, from the figures given it would appear the property was worth more than the amount of the debt. Nevertheless, the court spoke of the removal of the fixtures as "impair[ing] and render[ing] insufficient the mortgage security." (80 Cal. at p. 249.) It also appears, however, that after application of the proceeds of the foreclosure sale to the debt, there was a deficiency of $9,947.50 (80 Cal. at p. 250.) How this deficiency came about is not disclosed in the opinion. Certainly the removal of fixtures valued at $4,950 should not have produced a deficiency of $9,947.50.

Further, it may be of some significance that *Robinson* v. *Russell* was an injunction case. Leipziger indicates that in suits by a mortgagee to enjoin waste impairment of security is established if the value of the property is so diminished that it no longer affords the mortgagee a reasonable margin above the amount of the debt. He reasons that since an injunction suit contemplates the mortgage will continue in force, the mortgagee will continue to have a loan at risk after he obtains the injunction, that the mortgagee is entitled to a reasonable margin of security above the amount of the debt and that a rule tying substantial impairment to foreclosure value would give him inadequate protection. (Leipziger, *supra,* 64 Cal.L.Rev. at p. 1099, see also p. 1101.)

In any event, the definition of impairment of security given in *Cornelison* was undoubtedly correct in the circumstances presented. The trust deed holder had foreclosed the security and, as we have pointed out, in that situation if the value of the property was equivalent to the amount of the debt (plus foreclosure costs), the trust deed holder was entitled to nothing more. In *Cornelison* the fact that the value of the property was equal to the amount of the debt plus foreclosure costs was established by the full credit bid of the trust deed holder at the foreclosure sale. (15 Cal.3d at p. 607.) Furthermore, according to Leipziger the *Cornelison* definition represents the majority view in lien theory jurisdictions in actions for damages for waste. (Leipziger, *supra,* 64 Cal.L.Rev. at p. 1097 [text preceding fn. 51].)

than the amount of the debt was appropriate. (See Leipziger, *supra*, 64 Cal.L.Rev. at pp. 1097-1098.) Here, the debtor-creditor relationship and the security transaction are ongoing and will continue after disbursement of the condemnation award. As we shall explain, application of the debt equivalency rule in these circumstances would be inequitable and inconsistent with the essential bargain and reasonable expectations of the parties. There is no indication in *Cornelison* that the court was attempting to articulate an immutable definition of impairment of security applicable to all cases regardless of their circumstances (cf. *Wellenkamp* v. *Bank of America*, 21 Cal.3d 943, 948, 953 [148 Cal.Rptr. 379, 582 P.2d 970]; *Tucker* v. *Lassen Sav. & Loan Assn.*, 12 Cal.3d 629, 639 [116 Cal.Rptr. 633, 526 P.2d 1169]), and it would be unreasonable to impute to the court any such intention.

Moreover, whereas the case at bench involves the proper apportionment between the owner and lienholders of an award resulting from the taking by eminent domain of a portion of the secured property, the *Cornelison* case, as previously mentioned, was an action for damages for waste against the owners. Although the verbalizations used by courts in both these types of cases are the same, we entertain some doubt that definitions articulated in one may automatically be applied with propriety to the other. First, although we think it likely the rules applied to apportionment in condemnation cases have been influenced by the rules in the waste cases, the law applicable to the latter was affected to some extent by the early common law relating to estates in land and the common law forms of action. (See *Cornelison* v. *Kornbluth, supra*, 15 Cal.3d at pp. 597-598; Leipziger, *supra*, 64 Cal.L.Rev. at pp. 1089-1094.) It is not entirely clear that these historical influences on the rules developed in the waste cases are rationally related to the problem of properly apportioning a condemnation award between the owner and a lienholder. Secondly, while the two types of cases are obviously similar to the extent that in both the lienholder claims to have been damaged by injury to or destruction of a portion of the property constituting the security and seeks to recover a fund of money to compensate therefor, the fundamental problems and, therefore, the issues and considerations in the two types of cases are not the same. The waste cases usually involve injury to the land, not its outright appropriation. Some authorities suggest that difference supports a difference in the applicable rules of law in the eminent domain cases. (See Teague, *supra*, 44 Texas L.Rev. at pp. 1549-1550; 1 Orgel, *supra*, § 115, p. 488; cf. 27 Am.Jur.2d, Eminent Domain,

§ 257, pp. 36-37.)[11] More importantly, the fundamental conflict involved in the waste cases is that between the right of the owner and possessor of the property to use it and its substance and the lienholder's right to maintain the value of his security. (See, e.g., *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at pp. 597-598; *Miller* v. *Waddingham, supra,* 91 Cal. at pp. 380-381, 382; *Buckout* v. *Swift, supra,* 27 Cal. at p. 436; *Robinson* v. *Russell, supra,* 24 Cal. at p. 472.) There is no fund of money readily at hand. If a fund is to be created by an assessment of damages it is to come from the owner. In a real sense money extracted from the owner to be turned over to the lienholder for application on the debt may be considered a *pro tanto* prepayment of the debt by the owner-debtor. If the owner-debtor does not have the money he will be required to refinance or, worse, he may lose his equity in the property. In condemnation cases the essential conflict is entirely different and the consequences to the owner-debtor of awarding all or part of the award to the lienholder are not nearly so dire as assessing damages against the owner-debtor for waste. The essential conflict is that between the owner and lienholder with respect to a fund of money, presumably not expected or contemplated by either party. Should it be given to the owner-debtor for whatever use he might see fit or should all or part of it be turned over to the lienholder for application on the debt? Although in one sense turning the money over to the lienholder may be viewed as a partial prepayment of the debt, in no event is the owner-debtor required to pay any money out of his own pocket in advance of the time specified nor is he required to refinance. The fund of money already necessarily exists by virtue of the condemnation and comes from the condemner. If the fund of money is turned over in whole or in part to the lienholder for application on the debt, the owner-debtor in a large sense loses nothing, for not only is his debt reduced to that extent but, in addition, his total interest expense will be lessened accordingly. (Cf. *Lee* v. *Murphy,* 253 Cal.App.2d 205, 211 [61 Cal.Rptr. 174]; *Woody* v. *Lytton Savings & Loan Assn., supra,* 229 Cal.App.2d at p. 647.) Even in the event of a subsequent default and foreclosure, the owner-debtor is out nothing he would have had had there been no taking by eminent domain. Additionally, in the case of waste the lienholder frequently has the right to protect his interest by immediate foreclosure (see Leipziger, *supra,* 64 Cal.L.Rev. at pp. 1091-1092), whereas, generally, the lienholder has no such right in the case of a partial condemnation. The differences between the two types of cases are

---

[11]A taking for an easement for example might with some justification be viewed as akin to a long-term lease or license for use of a portion of the property, compensation for which would go to the owner.

significant and while they may not compel the adoption of different rules for determination of whether there has been an impairment of the security, the law would suffer no embarrassment by the adoption of different rules in recognition of these substantial differences.[12]

Noting that the lienholder is entitled to no more than payment of the secured debt, owner argues that what the lienholder bargained for and can reasonably expect is security that has a value equal to the debt. Thus, it is asserted the debt equivalency rule accords with the bargain and reasonable expectations of the parties. Alternatively, it is urged, that the very most the lienholder has bargained for is the margin of security over and above the debt afforded by the value of the land in excess of the debt at the inception of the security transaction. Owner maintains, therefore, that the security should never be deemed impaired unless the security to debt ratio has been reduced by the taking below that existing at the inception of the security transaction.

What then is the bargain and what are the reasonable expectations of the parties to a transaction in which a mortgage or deed of trust is created? Obviously these will vary depending upon many factors including whether the lien is to secure a third-party loan (hereafter loan) or is to secure the seller for the balance of the purchase price of the property (hereafter sale), whether the transaction is subject to antideficiency statutes, the nature of the property (e.g., desert acreage, high rise building, etc.) and the duration and terms for payment of the debt (e.g., interest only, periodic installments of principal and interest, etc.). Nevertheless, some valid generalizations can be made.

---

[12]In *Cornelison* itself the court recognized a not entirely dissimilar distinction between an action for waste against an owner-debtor and an action by a lienholder against a third party for tortious injury to the security, indicating the two types of cases involved "different considerations and rules." (15 Cal.3d at pp. 598-599, fn. 3; also cf. *U. S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d at p. 15.)

Since the "injury" results from the conduct of a third person, the condemner, and since the compensatory fund of money is furnished by the third person, the condemnation apportionment cases bear a greater similarity to actions by a lienholder seeking damages for injury to the property resulting from the tortious conduct of a third person than to actions for waste by the owner. Even there, however, there is a difference in the rights and remedies of the lienholder which may be significant. In the tort cases, the lienholder may proceed directly against the tortfeaser independently of the owner, at least so long as the owner has not recovered judgment for the entire loss. (See *American Sav. & Loan Assn.* v. *Leeds, supra,* 68 Cal.2d at p. 614, fn. 2; *U. S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d at p. 17.) In California the only remedy available to the lienholder when a portion of the property constituting the security is taken by eminent domain is to seek to participate in the condemnation award by an apportionment proceeding. (See Code Civ. Proc., §§ 1260.220, 1268.710 [formerly § 1246.1].)

Subject to the obligation not to commit waste, the owner is to have the possession and use of the property and all income derived from its use. The owner may reasonably expect to have to pay on the debt from his own funds only those amounts required by the agreement and only at the agreed times. Ignoring any problems of a "due on sale" provision in the security instrument, the owner is entitled to sell his equity if he can find a buyer willing to purchase the property subject to the lien. Ignoring any problems of a "due on encumbrance" provision in the security instrument, the owner may also borrow against his equity on the security of a junior encumbrance. In either such event, however, the lienholder's interest in the property is unaffected. The lien continues as before on the whole property whatever its value. No matter how greatly the property may have appreciated in value, so long as the debt remains unpaid the owner may not realize on his equity by selling a portion of the property free and clear of the lien. (Civ. Code, § 2912.) The lien extends to the whole and every part of the property.

It will almost invariably be true at the inception of the security transaction that the credit extended is less in amount than the value of the property. Thus, the authorities are virtually unanimous in pointing out that the lienholder bargains for and expects a margin of security over and above the amount of the debt. (See Leipziger, *supra,* 64 Cal.L.Rev. at pp. 1097-1101 [citing at fn. 52, Osborne, Handbook on the Law of Mortgages (2d ed. 1970) § 128, p. 212]; Teague, *supra,* 44 Texas L.Rev. at p. 1548; 1 Orgel, *supra,* § 115, p. 489.) It would probably be accurate to say as a general proposition that sellers may be satisfied at inception with a smaller security margin than lenders. But we think it also accurate to say that in either case both the debtor and the creditor generally expect the margin of security to increase with time. Where the debt is to be repaid in periodic installments of principal and interest this is obviously so. (See Leipziger, *supra,* 64 Cal.L.Rev. at p. 1100.) In other cases, where the security transaction involves a sale, the purchaser-debtor would generally not buy if he did not expect the property to increase in value. Where a loan on property already owned is involved, it is likely the owner-debtor would sell the property rather than borrow against it if he did not expect its value to increase. Additionally, it is hardly likely the parties will be ignorant of the historical rise in the value of land, although, of course, that historical trend may not prove applicable to any given period of time or any specific parcel of land. The important point, however, is that the parties do not bargain for maintenance of the margin of security existing at the inception of the security transaction. The

bargain is that the whole parcel of land, whatever its value, will be security for the debt, and that in the event of default and foreclosure the entire property, at its increased value if that expectation has materialized, will be available for satisfaction of the debt.

Where a deficiency judgment is statutorily prohibited, the lienholder bears the risk of any inadequacy of the security resulting from its overvaluation at the inception of the transaction or a decline in value caused by market conditions. However, the lienholder does not expect and antideficiency legislation does not require him to assume the risk of inadequacy in the security resulting from "bad faith" waste, tortious injury to the property by third persons or a partial taking of the property by eminent domain.[13] (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 604, including fn. 9; *American Sav. & Loan Assn.* v. *Leeds, supra,* 68 Cal.2d at pp. 614-615, fn. 2; *Los Angeles T. & S. Bk.* v. *Bortenstein, supra,* 47 Cal.App. at p. 424.) On the contrary, where a deficiency judgment is legislatively proscribed, it is all the more important that the integrity of the security be safeguarded. (See *American Sav. & Loan Assn.* v. *Leeds, supra,* 68 Cal.2d at p. 615, fn. 2.)

■ From all of the foregoing, we conclude that the debt equivalency rule is appropriate only in those situations in which the lien has been or immediately will be foreclosed so that the debtor-creditor relationship and the security transaction are at an end. In those situations the lienholder is fully protected if the value of the property is at least equal to the amount of the debt and, as in *Bortenstein,* if the value of the security has not yet been ascertained, a lien or trust may be imposed on all or part of the award for payment of any ensuing deficiency pending determination of that fact. (See also *Pomona College* v. *Dunn, supra,* 7 Cal.App.2d at pp. 230, 232; *Rose* v. *Conlin, supra,* 52 Cal.App. at p. 232.) ■ ■
■ However, where the debtor-creditor relationship is ongoing and the security transaction is to continue in force after distribution of the condemnation award, utilization of the debt equivalency rule in determining whether there has been an impairment of the security would be in most cases inconsistent with the bargain and reasonable expectations of the parties and inequitable; it would ignore the bargain and mutual expectation that the lienholder will have a margin of security over and above the amount of the debt; in a real sense it would impair the security

---

[13]Where, as here, the security document contains an express provision for disposition of condemnation proceeds it may reasonably be presumed that the provision reflects the expectations of the parties. (Cf. *Lee* v. *Murphy, supra,* 253 Cal.App.2d at p. 209.)

without compensation; and it would, in effect, permit the owner-debtor to realize on his equity in the property by selling (albeit involuntarily) a portion of the property free and clear of the lien contrary to the expectations of either party. (See *Buell Rlty. Note Col. Tr.* v. *Central Oak Invest. Co., supra,* 483 S.W.2d at p. 27; Leipziger, *supra,* 64 Cal.L.Rev. at pp. 1097-1099; Teague, *supra,* 44 Texas L.Rev. at pp. 1542, fn. 41 and accompanying text, 1548; 1 Orgel, *supra,* § 115, pp. 489-490.)

, While the original ratio rule recognizes a lienholder's right to some margin of security over and above the amount of the debt and thus strikes a somewhat more equitable balance than the debt equivalency rule, it does not truly reflect the real bargain of the parties that the lienholder will have the security of the entire property even if it has increased in value—whatever its value may be. Its utilization would be wholly inappropriate where the debt was to be paid in periodic installments of principal and interest, presumably increasing the margin of security with each payment. Its utilization would also be inappropriate where the parties affected by the security transaction at the time of the partial condemnation are not the original parties to the transaction, i.e., where remote parties at dates subsequent to the original transaction have succeeded to the interests of the owner or the lienholder or both. The original security to debt ratio is largely irrelevant to the expectations of successors in interest of the original parties. The values significant to them will be primarily those existing at the time they acquire their interest. Where remote parties have succeeded to the interests of the original owner and lienholder at different times there is no bargain between them at all and their respective expectations may relate to entirely different values. Nevertheless, the original ratio rule or something akin thereto has received some recognition (see *Buell Rlty. Note Col. Tr.* v. *Central Oak Invest. Co., supra,* 483 S.W.2d at p. 27; 1 Orgel, *supra,* § 115, at p. 489;[14] Leipziger, *supra,* 64 Cal.L.Rev. at pp. 1099, 1101; cf. *Trustees of Schools* v. *Harshman* (1914) 262 Ill. 72 [104 N.E. 235]; *Investors Syndicate of America* v. *Dade County* (Fla.App. 1958) 98 So.2d 889; *Yakima Water, Light & Power Co.* v. *Hathaway* (1897) 18 Wash. 377 [51 P. 471]) and may serve as a useful point of departure in some cases.

, What then of the pretake ratio rule advocated by trust deed holders by which the security would be deemed impaired if the partial

---

[14]Although Orgel uses the term "original ratio," it is not at all clear whether by "original," the reference is to the time of the inception of the security transaction or to the time of the taking in condemnation.

condemnation left the security to debt ratio less than that existing immediately prior to the taking and under which a proper apportionment of the condemnation award would seek to restore the security to debt ratio existing just before the take? This is the rule thought preferable by most of the commentators. (See Teague, *supra,* 44 Texas L.Rev. at pp. 1542, 1543, 1547-1548; Leipziger, *supra,* 64 Cal.L.Rev. at pp. 1099, 1100, 1101; cf. 1 Orgel, *supra,* § 115, p. 489 [see fn. 14, *ante*].) However, there appears to be little case authority for its use. (But cf. *Seaboard All-Florida Ry.* v. *Leavitt* (1932) 105 Fla. 600 [141 So. 886, 891-892]; *Atlantic Coast Line R. Co.* v. *Rutledge* (1935) 122 Fla. 154 [165 So. 563, 565-568].) This is the rule, however, now prescribed by statute for use in allocating a condemnation award resulting from a partial taking as between junior and senior lienholders in certain circumstances. (§ 1265.230.)[15]

We agree that the pretake ratio rule will achieve an equitable result in many cases. Additionally, we think it probable this rule more nearly accords with the bargain and reasonable expectations of the parties than any of the others suggested. It is not true as owner asserts that use of this rule results in the lienholder getting all of any condemnation award in which there are no severance damages. On the contrary, its use invariably results in a division of the award between the owner and lienholder. An example will serve to illustrate the point. Assume the pretake security to debt ratio is $200,000 to $100,000 and the portion taken is valued at $50,000, reducing the security to $150,000. To restore the 2 to 1 pretake ratio, the lienholder would have to get $25,000. The posttake security to debt ratio would then be $150,000 to $75,000—2 to 1. Of the $50,000 proceeds, the owner would receive $25,000. Owner's error is, apparently, in forgetting that any money paid to the lienholder is applied upon and reduces the debt.

However, the pretake ratio rule may not appropriately be applied in all cases either. The greater the lienholder's margin of security immediately before the take, the greater will be the proportion of the award allocated to the lienholder. Conversely, the smaller the lienholder's margin of security immediately prior to the take, the smaller will be his allocation of

---

[15]Subdivision (b) reads: "As used in this section, 'impairment of security' means the security of the lienholder remaining after the taking, if any, is of less value in proportion to the remaining indebtedness than the value of the security before the taking was in proportion to the indebtedness secured thereby." Subdivision (a) of the section, however, provides in part: "This section provides only for allocation of the portion of the award, if any, that will be available for payment to the junior and senior lienholders and does not provide for determination of the amount of such portion."

the condemnation award. These results would appear to be at odds with the underlying philosophy of the impairment of security rule and indicate the pretake ratio rule should not be utilized without modification where the value of the property has increased greatly in excess of the reasonable expectations of the parties at inception or where for some reason the value of the property was already less than the debt before the partial condemnation. In the latter case any reduction in the value of the property resulting from the taking will necessarily to that extent constitute an impairment of the security.

The literature suggests two other rules that might possibly be used in determining whether there has been an impairment of the security. One, noted and rejected by several writers, would determine impairment of the security by comparing the market value of the secured debt before and after the partial condemnation. (See 1 Orgel, *supra,* § 115, p. 489; Teague, *supra,* 44 Texas L.Rev. at p. 1542.) The market value of the secured debt would depend in large part upon factors unrelated to impairment of the security, such as fluctuations in the prevailing interest rate, the marketability of the particular secured debt and, in some cases, financial strength and repute of the particular debtor. Utilization of such a test, therefore, would not likely provide an accurate measure of impairment of the security or produce a result consistent with the reasonable expectations of the parties.

The second, mentioned principally in connection with the waste cases, would equate impairment of security with the reduction in value of the property constituting the security below the margin of safety that a conservative lender would consider reasonable (the conservative lender rule). (See Hetland, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) § 6.45, pp. 306-307; Leipziger, *supra,* 64 Cal.L.Rev. at p. 1099.) This rule, of course, would recognize that the lienholder is entitled to a margin of security in excess of the amount of the debt, and, while it might be a highly useful tool in some cases, its relevancy would be somewhat limited in a case, such as the case at bench, in which the secured debt was created as the result of a sale rather than a loan by a commercial lender and the lien is not held by a commercial lender in its capacity as such. (See fn. 4, *ante.*)

From our review of the several possible rules and the relation-ship between lienholder and owner, we are persuaded that each rule suggested may be appropriate, helpful or even decisive in a given

situation, but that no one of them may be appropriately applied to produce a fair result in all cases. Accordingly, we hold that the question whether a lienholder's security has been impaired by a partial condemnation, which is normally a question of fact (*Buell Rlty. Note Col. Tr.* v. *Central Oak Invest. Co., supra,* 483 S.W.2d at p. 27; cf. *Schoolcraft* v. *Ross,* 81 Cal.App.3d 75, 81 [146 Cal.Rptr. 57]), is to be determined in light of the circumstances of the particular case considering all of the relevant factors. Without attempting to list all possible relevant factors, we mention those that occur to us offhand: whether the debt and security transaction resulted from a sale or a loan; whether or not a deficiency judgment is legally permissible; the terms for repayment; the interest rate charged compared with the prevailing interest rate in similar transactions; the original, pretake and posttake security to debt ratios; the length of time the transaction has been in effect; the amount of the debtor's equity and the amount actually invested by the debtor in the property constituting the security; the payment record of the debtor prior to the partial condemnation; the length of time the transaction is to continue in force after the partial condemnation; whether or not the partial condemnation necessitates repair to or reconstruction of the property; the amount of the annual taxes and assessments against the property; whether the debt is currently paid or is in default; facts bearing on the likelihood of default by the debtor; the nature of the security property; whether or not the security property is likely to be readily salable; and whether or not it is likely it can be sold at a foreclosure sale for a price approximating its fair market value.

In view of the relevant factors we cannot say in the case at bench that the trial court erred in finding the trust deed holders' security impaired and in apportioning the condemnation award between owner and the trust deed holders in the manner it did. In the first place, owner's contentions that the value of the property following the take was in excess of the amount of the debt or the amount of the debt plus the margin of security over and above the debt that existed at the inception of the several deeds of trust are based on the assumption that the value of the whole property was $6,000 per acre and that the value of the property remaining after the take was $6,000 per acre less the severance damages. Owner asserts all parties stipulated to these facts at the apportionment phase of the trial but the record does not support this assertion. It is true that all parties presented arguments in which the figures used assumed those facts, but the Goldsworthy group at least expressly declined to stipulate to these assumptions as to value and expressly indicated in their

memorandum that these figures were being used for illustrative purposes only. It is of course undisputed that the jury valued the 6.1 acres taken at $36,600, $6,000 per acre. It does not necessarily follow, however, that either the whole parcel or the remainder had the same per acre value. The record is devoid of evidence that the 6.1 acres taken were representative of the whole parcel. No transcript of the testimony of the expert appraisal witnesses, which is said to have been conflicting, is included in the record on appeal. Moreover, although findings of fact and conclusions of law were requested and apparently made, they likewise are not made part of the record on appeal. As a result, the record does not establish the pretake value of the whole property or the posttake value of the remainder, and owner has failed to meet its burden on appeal of affirmatively proving reversible error. The judgment of the lower court is presumed correct and all intendments and presumptions are indulged to support it on matters as to which the record is silent; error must be affirmatively shown. (*Denham* v. *Superior Court,* 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235, p. 4225; accord: *Walling* v. *Kimball,* 17 Cal.2d 364, 373 [110 P.2d 58].)

■ However, even if owner's assertions that the whole parcel was worth $6,000 an acre before the taking and the remainder was worth $6,000 per acre less $45,000 severance damages after the taking are assumed to be correct, no error appears. At the time the first trust deed was created the value of the property was $163,800 and the secured debt was $138,800. The original security to debt ratio was therefore approximately 1.18 to 1. At the time the second trust deed was created the property had increased in value to $205,000, $66,200 in excess of the indebtedness secured by the senior lien ($138,800). The debt secured by the second deed of trust was $63,558. The original security to debt ratio for the junior lienor was thus approximately 1.04 to 1. Assuming a value of $6,000 per acre, immediately before the condemnation the property was worth approximately $305,500 (50.92 acres × $6,000 per acre). The pretake security to debt ratios were therefore 2.20 to 1 ($305,500 ÷ $138,800) and 2.62 to 1 ([$305,500 − $138,800] ÷ $63,558) respectively. Thus, both trust deed holders enjoyed a comfortable margin of security over and above the amounts of the secured debts. While these margins were considerably in excess of the margins existing at the time the trust deeds were created in 1967 and 1971, there is no evidence that they were in excess of those customary in similar security transactions originating in

those years and still in force, or that they were unreasonably high when measured by the expectations of the parties at inception.

After the taking of the 6.1 acres the remainder was worth approximately $219,000 ([44 acres × $6,000 per acre] − $45,000 severance damages). By this time, however, the secured indebtedness had increased due to owner's default in the payment of taxes[16] and interest and accrual of foreclosure costs. The amounts of the secured indebtedness were $153,669 ($138,800 + $14,869) and $64,670 ($63,558 + $1,112) respectively. If the trust deed holders received no part of the condemnation award the posttake security to debt ratios would have been approximately 1.43 to 1 ($219,000 ÷ $153,669) and 1.01 to 1 ([$219,000 − $153,669] ÷ $64,670) respectively, both substantially reduced from the pretake ratios, and in the case of the second trust deed less than even the original security to debt ratio. The margin of security for the second trust deed holder was reduced to less than $1,000 over and above the amount of the secured debts.

On these facts, there can be no question but that the security of the second deed of trust was substantially impaired. While the first trust deed presented a closer question, in view of the facts that the interest rate was only 7 percent, the property was unimproved acreage in a relatively thinly developed area affording no great assurance of price stability, the trust deed secured a purchase money obligation thus precluding any possibility of deficiency judgment, there already existed a substantial default including some $4,446 in delinquent taxes constituting a superior lien on the property, the debtor-creditor relationship was to continue until 1983 with only interest payments to be made in the interim, and owner had invested in the property only the meager sum of $2,700, the court's finding that the security of the first trust deed was also impaired cannot be said to be unsupported by the evidence or erroneous as a matter of law. Moreover, there is no showing that the amount allocated to the trust deed holders together is excessive,[17] and the trust deed holders do not complain of the allocation made as between them.

[16]Technically, the unpaid taxes may not be part of the debt. The obligation of owner to pay the taxes is secured by the trust deed, however, and the taxes unpaid constitute a superior lien reducing the security.

[17]Almost all the arguments of the parties and the illustrative computations offered by them treat the debts secured by the two trust deeds together. While that is appropriate in respect to the second deed of trust, the security position of the first deed of trust would have been more appropriately considered separately.

As indicated previously, the pretake ratios were 2.20 to 1 and 2.62 to 1 respectively. The posttake ratios after apportionment are 2.04 to 1 ($219,000 ÷ [$153,669 − $46,804]) and 2.00 to 1 ([$219,000 − $106,865] ÷ [$64,670 − $8,667]). Thus, the apportionment made by the court did not even fully restore the lienholders to their pretake security positions. To do that, it would have been necessary to allocate $73,200[18] to the lienholders, whereas the court actually allocated $55,472 to the two trust deed holders and some $26,128 to owner. Moreover, of the $55,472 allocated to the trust deed holders, almost $16,000 represented past due interest and unpaid taxes which owner should already have paid. Had owner paid these sums when they became due it would have received approximately $42,109—more than half the total condemnation award.

No error has been demonstrated.

The judgment is affirmed.

McDaniel, J., and Morris, J., concurred.

---

[18]The $73,200 figure is computed as follows:

$x$ = the amount the posttake secured debt must be to restore the pretake ratio. Once its amount is determined, $x$ is deducted from the full indebtedness secured by the deed of trust to determine the amount that must be paid to the trust deed holder to restore the pretake ratio.

Thus, in relation to the first trust deed:

$$\frac{\$305,500}{\$138,800} = \frac{\$219,000}{x}; \quad x = \$99,545.$$

$153,669 [full amount of indebtedness secured by first trust deed]

− $99,545 = $54,124.

In relation to the second trust deed:

$$\frac{\$305,500 - \$138,800}{\$63,558} = \frac{\$219,000 - \$99,545 \text{ [amt. of secured indebtedness on first trust deed after allocation]}}{x};$$

$x$ = $45,593. $64,670 [full amount secured by second trust deed] − $45,593 = $19,076.

The aggregate amount that must be paid to the trust deed holders to restore the pretake ratios is thus $73,200 [$54,124 + $19,076].