[L.A. No. 31891. June 13, 1985.]

REDEVELOPMENT AGENCY OF THE CITY OF BURBANK,
Plaintiff and Respondent, v.
WALTER L. GILMORE, JR., et al., Defendants and Appellants.

COUNSEL

Irsfeld, Irsfeld & Younger, O'Neill & Huxtable, Richard L. Huxtable and Francis H. O'Neill for Defendants and Appellants.

John Briscoe, Sandi L. Nichols, Thomas B. Brown, Washburn & Kemp, Fadem, Berger & Norton, Michael M. Berger, Parkinson, Wolf, Lazar & Leo, Richard B. Wolf and Michael W. Connally as Amici Curiae on behalf of Defendants and Appellants.

William B. Rudell, City Attorney, and Richard W. Marston, Senior Assistant City Attorney, for Plaintiff and Respondent.

Robert F. Carlson, Gordon S. Baca, Charles E. Spencer, Jr., Gerald J. Geerlings, County Counsel (Riverside), Peter H. Lyons, Principal Deputy County Counsel, Jay G. Vickers, Deputy County Counsel, Kenneth L. Nelson, County Counsel (Santa Barbara), James B. Lindholm, Jr., County Counsel (San Luis Obispo), Donald S. Greenberg, City Attorney (San Buenaventura), K. Duane Lyders, City Attorney (Oxnard), James F. Rupp, Jr., City Attorney (Port Hueneme), Roger Picquet, City Attorney (San Luis Obispo), Mark G. Sellers, Acting City Attorney (Thousand Oaks), Dankert & Kuetzing, Thomas M. Dankert, Murray O. Kane, R. Bruce Tepper, Jr., Kathryn Reimann and Weiser, Kane, Ballmer & Berkman as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

GRODIN, J.—We confront an issue created by the sharp rise in market rates of interest during recent years. ■ When a public agency con-

demns property and exercises its statutory right to take possession before the condemnation price is set or fully paid, does the "just compensation" which the Constitution requires include interest at prevailing market rates rather than a lower "legal" rate specified in the Eminent Domain Law? We conclude that it does.

## FACTS*

Defendants Walter L. Gilmore, Jr., Pamela A. Gilmore, George W. Strattan, Howard L. Hudson, and Frances P. Hudson appeal from the respective judgments entered against them in this eminent domain action. Howard and Frances Hudson also appeal from the order denying their motion to recover litigation expenses and the order granting plaintiff's motion to tax costs.

On November 13, 1980, plaintiff Burbank Redevelopment Agency filed its complaint seeking condemnation of a parcel of real property owned by George Strattan and the Gilmores (parcel 9) and a separate parcel of real property owned by the Hudsons (parcel 11). In both cases, plaintiff invoked the so-called "early possession" or "quick-take" provisions of the Eminent Domain Law. Under that procedure, a condemning agency may take over condemned property prior to trial and judgment by depositing in court the "probable compensation" as determined by appraisal (Code Civ. Proc., § 1255.010[1]) and obtaining an "order for possession" (§ 1255.410). The condemnee may apply for the right to withdraw the court deposit or any portion thereof (§ 1255.210 et seq.).

When the "quick-take" procedure is used, the final award of compensation draws "legal interest," commencing when the agency took possession or when it was authorized to do so, whichever is earlier, and continuing until final payment. (§ 1268.310.) However, interest ceases to accrue on any amount previously deposited in court when the condemnee withdraws that amount. (§ 1268.320, subd. (a).) In other words, the condemnee receives interest on the difference between the final award and any amount previously deposited and withdrawn.

The legal rate of interest on judgments was 7 percent until July 1, 1983. (Cal. Const., art. XV, § 1.) On that date, as permitted by the Constitution,

---

*We are indebted to Justice Dalsimer, who prepared the superseded opinion of the Court of Appeal, Second Appellate District, Division One; at certain places our text incorporates language from that opinion. Part III of the Discussion section (*post,* pp. 807-809) is the Court of Appeal's text with minor editorial changes.

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

a statute raising the rate of judgment interest to 10 percent became effective. (§ 685.010.)[2]

On December 9, 1980, plaintiff deposited $200,000 toward parcel 9 and $160,000 toward parcel 11; the court thereupon issued orders authorizing plaintiff to take possession of both properties. Each order became effective 90 days after service—March 16, 1981, for parcel 9 and March 18, 1981, for parcel 11. An additional $125,590 was deposited on February 16, 1982, on account of parcel 9. Defendants withdrew the full amounts of their respective deposits.[3]

Later, at trial, the value of parcel 9 was fixed at $500,000. The value of parcel 11 was determined to be $284,000. Both amounts substantially exceeded the deposits previously made for the respective parcels. Defendants urged that they were entitled to market interest on the balances due. They introduced extensive and uncontradicted evidence about prevailing rates, during the period since plaintiff had gained possession of parcels 9 and 11, for mortgages, prime business loans, certificates of deposit, government and utility bonds, and government notes of various terms. All the representative rates were well above the 7 percent "legal" rate then in effect.[4]

The trial court also admitted Mr. Gilmore's declaration about costs the Gilmores had incurred in replacing parcel 9. The declaration stated that the

---

[2]Section 685.110 provides that it does not affect "the law relating to prejudgment interest." Nonetheless, it seems clear that section 1268.310, in mandating "legal interest" on condemnation awards paid after the public agency has obtained possession, intended the judgment rate to apply during *all* periods of the delay in payment, both pre- and postjudgment. No party suggests otherwise.

[3]Because defendants withdrew the deposits, this case does not present the issue whether condemnees are limited to the statutory rate of interest on amounts they choose to leave on deposit with the court pending trial and judgment. (See §§ 1255.210, 1268.320.) Therefore, we do not decide that question. Defendants here make no claim that interest during the interval between deposit and withdrawal was wrongly computed. The federal Declaration of Taking Act (40 U.S.C. § 258a) expressly disallows all interest on amounts deposited in court. The theory is that the deposit satisfies the government's payment obligation *pro tanto,* and the deposit is "available" for withdrawal by the condemnee; hence it cannot be considered a payment withheld or delayed (see discussion *post*). (*United States* v. *Blankinship* (9th Cir. 1976) 543 F.2d 1272, 1275; but cf., *United States* v. *53¼ Acres of Land, etc.* (2d Cir. 1949) 176 F.2d 255, 258-259 [interest on deposit is allowable where condemnee is denied withdrawal on grounds it exceeds fair value, if condemnee is vindicated at trial].)

[4]For example, there was evidence that, during 1981, the "prime rate" varied from 15.75 percent to 20.50 percent; mortgage rates ranged between 14 and 18 percent. After March 1981, rates on intermediate-term certificates of deposit by banks and savings and loan associations averaged between 13.5 percent and 15 percent. In 1981, average long-term government bond rates fluctuated between 9.97 percent and 15.13 percent; the average rate for January 1982 was 12.97 percent. In January and February 1982, the average rates on state and local government notes and bonds, rated Aaa by Moody's, ranged from 12.20 percent to 12.30 percent. The average 1981 rate for these obligations was 10.43 percent.

Gilmores purchased comparable property on February 10, 1981, with a down payment of $200,000 and borrowed the balance due, $225,000, at 14 percent.[5]

On June 30, 1982, an interlocutory judgment was entered as to parcel 11, awarding the Hudsons $124,000—the difference between plaintiff's deposit of $160,000 and the final assessed value of $284,000. Interest on this balance due was to accrue "at the legal rate" from March 18, 1981, the possession date for parcel 11, until final payment. On July 21, 1982, a similar judgment was entered as to parcel 9, awarding Strattan and the Gilmores $173,410—the difference between the two original deposits totalling $326,590 and the final assessed value of $500,000. Any balance due after March 16, 1981, the date of possession for parcel 9, was to accrue interest, again at the "legal" rate of 7 percent, until paid.

## DISCUSSION

### I.

Defendants renew their argument that when condemned property is taken before payment, interest on the balance due must be computed with reference to the prevailing market rate in order to provide constitutional "just compensation." (See U.S. Const., Amends. V, cl. 4, XIV; Cal. Const., art. I, § 19.) We agree.[6]

The governing principles are well established. ■ In *Seaboard Air Line Ry.* v. *U. S.* (1923) 261 U.S. 299 [67 L.Ed. 664, 43 S.Ct. 354], the United States Supreme Court explained that when private property is taken for public use, "[t]he just compensation to which the owner is constitutionally

---

[5]The declaration incorporated by reference facts set forth in the "Notice of Intention to Call Defendant, Walter L. Gilmore, Jr., as a Valuation Witness," which was filed July 29, 1981. Because the latter document was listed in appellants' designation of clerk's transcript but is not a part of the clerk's transcript, we have reviewed that document upon obtaining the superior court file. (Cal. Rules of Court, rule 12(a).)

[6]The Fifth Amendment just compensation clause was held applicable to the states through the due process clause of the Fourteenth Amendment in *Chicago, Burlington &c. R'D* v. *Chicago* (1897) 166 U.S. 226, 241 [41 L.Ed. 979, 986, 17 S.Ct. 581].

Defendants, basing their argument primarily on the federal Constitution, have assumed that the *California Constitutional* limit on *judgment* interest (art. XV, § 1), as applied *by statute* in eminent domain cases, also violates the Fifth Amendment in the condemnation context. However, the California Constitution imposes no limit on the rate of interest payable in eminent domain cases. Indeed, like the federal charter, it prohibits the taking of private property for public use unless "just compensation" has first been paid. (Art. I, § 19.) Thus, we see no conflict between the state and federal charters on the issue of interest as just compensation. The conflict, if any, arises between the interest provision of the Eminent Domain Law, on the one hand, and the just compensation clauses of *both* the state and federal Constitutions on the other. (See discussion, *post.*)

entitled is the *full and perfect* equivalent of the property taken. [Citation.]" This "means substantially that *the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken.* [Citation.]" (P. 304 [67 L.Ed. p. 669], italics added.)

Therefore, if the government pays for condemned property only after taking and using it, the owners "are entitled to have the *full* equivalent of the value of [its] use at the time of the taking paid contemporaneously with the taking." (*Phelps* v. *United States* (1927) 274 U.S. 341, 344 [71 L.Ed. 1083, 1085, 47 S.Ct. 611], italics added.) An award in the nature of interest "at a proper rate" is a "fair and reasonable" reimbursement for the deferred payment. (*Seaboard, supra,* 261 U.S. at p. 306 [67 L.Ed. at p. 670]; see also *Albrecht* v. *United States* (1947) 329 U.S. 599, 602-603 [91 L.Ed. 532, 537-538, 67 S.Ct. 606].) This element of "just compensation" is constitutionally required and "cannot be made to depend upon state statutory provisions." (*Seaboard, supra.*)

California's Eminent Domain Law provides for interest on a delayed condemnation award but limits interest to the legal rate. (§ 1268.310.) It now seems clear, however, that a statutory interest ceiling cannot prevail where it falls short of constitutional "just compensation" under the standard of *Seaboard* and *Phelps.* When the delay occurs during times of inflationary market interest rates which substantially exceed the statutory rate, application of the lower statutory limit denies the condemnee "the full equivalent of the [property's] value . . . at the time of the taking paid contemporaneously with the taking." (*Phelps, supra,* 274 U.S. at p. 344 [71 L.Ed. at p. 1085].)

Many courts have recognized that, while the statutory rate of interest may apply if it is constitutionally adequate, ultimate determination of the rate of interest required for "just compensation" is a judicial function. An adequate rate, these cases hold, must reflect conditions in the usual interest markets. (E.g., *Miller* v. *United States* (Ct.Cl. 1980) 620 F.2d 812, 837-838; *United States* v. *429.59 Acres of Land* (9th Cir. 1980) 612 F.2d 459, 464-465; *Blankinship, supra,* 543 F.2d at pp. 1275-1276; *King* v. *State Roads Com'n of State Hwy. Admin.* (1983) 298 Md. 80 [467 A.2d 1032, 1037-1038]; *Matter of City of New York* (1983) 58 N.Y.2d 532 [449 N.E.2d 399, 401-402]; *Marine Midland Bank, N.A.* v. *State* (1983) 118 Misc.2d 472 [460 N.Y.S.2d 902, 903-904]; *Department of Transp., etc.* v. *Rasmussen* (1982) 108 Ill.App.3d 615 [64 Ill.Dec. 119, 439 N.E.2d 48, 58]; *State by Spannaus* v. *Carney* (Minn. 1981) 309 N.W.2d 775, 776; *Textron, Inc.* v. *Commissioner of Transp.* (1978) 176 Conn. 264 [407 A.2d 946, 947-948]; *Township*

*of Wayne in County of Passaic* v. *Cassatly* (1975) 137 N.J. Super. 464 [349 A.2d 545, 550-551].)[7]

A recent, unanimous United States Supreme Court decision suggests acceptance of the principle that constitutionally proper interest must reflect market conditions. In *Kirby Forest Indus., Inc.* v. *United States* (1984) 467 U.S. 1 [81 L.Ed.2d 1, 11, 104 S.Ct. 2187], the court affirmed that interest is compensation for the delay between taking and payment, necessary to place the condemnee "in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation. [Citing *Phelps, supra,* 274 U.S. at p. 344 (71 L.Ed. at p. 1085), and *Seaboard, supra,* 261 U.S. at p. 306 (67 L.Ed. at p. 670).]" In a normal "straight condemnation" proceeding, said the court, where the government does not take possession and title until after judgment and full payment, the "taking" and the compensation are contemporaneous. Hence, no interest is due on the award. (467 U.S. at p. 10 [81 L.Ed.2d at pp. 11-12].)

The court noted, however, that the rule is otherwise under the "quick-take" provision, which allows the government to obtain title and possession before a final condemnation judgment is rendered and paid. In such cases, said *Kirby,* the landowner is constitutionally entitled to interest on any delayed payment "sufficient to ensure" a monetary position as favorable to him as if payment and taking had coincided. (*Id.,* 467 U.S. at p. 10 [81 L.Ed.2d at p. 11].) In a footnote, the court explained that this principle of "full and perfect" financial equivalency (see *Seaboard, supra,* 261 U.S. at p. 304 [67 L.Ed. at p. 669]) "underlies several decisions by courts of appeals, holding that the 6 per cent rate of interest prescribed by [the federal condemnation statute] is not a ceiling on the amount that can *and must* be paid by the Government. [Citations.] The United States has acquiesced in those decisions. . . ." (467 U.S. at p. 11, fn. 16 [81 L.Ed.2d at p. 11], italics added.)

---

[7]The issue of legal versus market interest was raised in a recent Court of Appeal case, *L & M Professional Consultants, Inc.* v. *Ferreira* (1983) 146 Cal.App.3d 1038 [194 Cal.Rptr. 695], certiorari denied (1984) — U.S. — [80 L.Ed.2d 462, 104 S.Ct. 1914]. The court noted older authorities applying the legal rate as well as the more recent decisions requiring the market rate. It concluded, however, that it need not reach the question whether market interest was necessary to provide just compensation under the particular circumstances, since the landowner, besides receiving legal interest, had been allowed to retain the benefits of possession and use of the property until after the full amount of the award was deposited. (Pp. 1057-1058.) The court's reasoning seems correct. Interest as a required element of just compensation is intended as reimbursement for *delay* between the *loss* of possession and use (i.e., the taking) and final payment (see discussion, *post*).

These remarks are technically dicta, as plaintiff and its amici[8] point out, since they are unnecessary to the court's holding that interest is not payable on "straight condemnation" awards. However, the justices have unanimously approved federal cases declaring that the requirement of "just compensation" prevails over statutory interest ceilings. This seems a clear signal of the high court's views on the issue.[9]

Plaintiff and its amici point to decisions suggesting that the California statute's provision for interest at the legal rate is intended simply as a reasonable measure of *damages* for lost use of the *property* during the period between public possession and final payment, where no other evidence of such damages is introduced. (E.g., *Pierpont Inn* v. *State of California* (1969) 70 Cal.2d 282, 299-300 [74 Cal.Rptr. 521, 449 P.2d 737]; *Metropolitan Water Dist.* v. *Adams* (1940) 16 Cal.2d 676, 680-681 [107 P.2d 618]; *City of San Rafael* v. *Wood* (1956) 144 Cal.App.2d 604, 608 [301 P.2d 421].) But the Supreme Court's more recent remarks in *Kirby* make clear that interest is constitutionally compelled as reimbursement for lost use of *money due as compensation for the property,* but not paid contemporaneously with the taking.[10]

Plaintiff and its amici suggest that decisions imposing prevailing-rate interest under the "quick-take" provisions of the *federal* condemnation law are inapposite to California practice. They urge that California's "quick-

[8]Amicus curiae briefs on behalf of plaintiff have been filed by (1) the California Department of Transportation; (2) the County of Riverside and the Riverside County Flood Control and Water Conservation District; (3) the California League of Cities; and (4) the Counties of Santa Barbara and San Luis Obispo; the Cities of Oxnard, Port Hueneme, San Buenaventura, San Luis Obispo, and Thousand Oaks; and the Redevelopment Agencies of Oxnard, Port Hueneme, and San Buenaventura. Amicus curiae briefs on behalf of defendants have been filed by (1) Leslie Salt Co.; (2) Attorney Michael M. Berger; and (3) the Greater Western Council, Inc., Boy Scouts of America.

[9]The *Kirby* court separately rejected a claim that interest at the market rate was also due in "straight condemnation" cases as a rough measure of the assumed *increase in value of the condemned land itself* when the taking and final payment occur long after the "valuation date." In *Kirby,* the condemned land was valued as of the first day of trial, March 6, 1979, but payment and transfer of title took place over three years later, on March 26, 1982. The court noted that "[c]hange in the market value of particular tracts of land over time bears only a tenuous relationship to the market rate of interest. . . ." Nonetheless, it recognized that any substantial increase in fair market value between the dates of valuation and taking must be paid in order to provide "just compensation." Thus, the condemnee in a federal proceeding may move, after the taking, to amend the award in order to litigate the issue of interim increase in fair market value. (467 U.S. at pp. 17-18 [81 L.Ed.2d at pp. 15-16].)

[10]Indeed, many years before *Kirby,* the court explained: "[t]he reasoning on which interest is added to value as a part of 'just compensation' in court condemnation proceedings . . . is that when a court determines just compensation, it first fixes *bare value at the time of the taking* and adds a sum to compensate for *deferred payment of bare value* so as to make the property owner whole as required by the Fifth Amendment. . . ." (*Albrecht, supra,* 329 U.S. at p. 603 [91 L.Ed. at p. 538], italics added.)

take" law, while it may cause *interim damage* to the landowner's *property* rights for which he is entitled to some compensation, does not produce a constitutional taking of the property itself prior to final payment.

Technical differences do exist between the state and federal schemes. Under the federal "quick-take" provision (40 U.S.C. § 258a), the government may file a pretrial "declaration of taking" and deposit the estimated value of the property. At that moment, "title in fee simple absolute," or whatever lesser estate the government seeks, "shall vest" in the United States, "and the right to just compensation," including interest on any amount by which the final award exceeds the deposit, "shall vest in the persons entitled thereto." (*Ibid.*) Taking clearly occurs at the instant title passes in this fashion; the government thereupon becomes "irrevocably committed" to pay just compensation, and it may not later abandon the proceedings. (See 40 U.S.C. §§ 258c, 258e; *Kirby, supra,* 467 U.S. at p. 11, fn. 16 [81 L.Ed.2d at p. 11]; *Catlin* v. *United States* (1945) 324 U.S. 229, 242-243 [89 L.Ed. 911, 920-921, 65 S.Ct. 631].)

By contrast, California's "quick-take" law provides only for an "order of possession" upon deposit of estimated value. (§ 1255.410.) The date of possession may be postponed on hardship grounds (§ 1255.420), and it may be stayed while the condemnee litigates a potentially meritorious claim that the public agency does not have the right to take the property by eminent domain (§ 1255.430). Moreover, even where the public agency has taken possession of the property before final judgment, it may be permitted to abandon the condemnation effort unless the condemnee has so adversely changed his position in justifiable reliance on the proceeding that he cannot be made whole. (§ 1268.510.) And title under California law does not pass until a final order of condemnation has been recorded. (§ 1268.030.)

Yet any distinctions between the state and federal systems are not of constitutional significance in determining the date of taking. The "title" which vests in the United States under the federal quick-take statutes is a "defeasible" one; a federal condemnee, like his California counterpart, may still litigate the government's right to exercise the power of eminent domain against his property. (*Catlin, supra,* 324 U.S. at p. 241 [89 L.Ed. at p. 920].) Thus, except for absolute foreclosure of the government's right to abandon under the federal law, the rights obtained and lost under the state and federal quick-take procedures are essentially the same.

Moreover, the California statutes themselves suggest an assumption that a constitutional taking occurs no later than the moment at which the public agency obtains the right of early possession. While the normal valuation date is either the date of commencement of proceedings, or of com-

mencement of trial (§§ 1263.120, 1263.130), a different rule applies in quick-take situations. There, the land is to be valued as of the date of the deposit of estimated value which permits an order for early possession. (§ 1263.110.) And any compensation awarded is to draw prejudgment interest from the date the agency takes possession. (§ 1268.310, subd. (b).)

■ These sections give effect to the fact that, except for defenses to the exercise of eminent domain, a landowner in California is permanently deprived of all of his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use.[11] We conclude, therefore, that a constitutional taking occurs at this time. Accordingly, "just" compensation is the "full and perfect" monetary equivalent of the fair market value of the land paid at the time the taking occurred. (*Seaboard, supra,* 261 U.S. at p. 304 [67 L.Ed. at p. 669].) Interest at a rate reasonable in light of market conditions is the proper measure of reimbursement for any delay in payment.

Plaintiff and its amici urge that the California statute, unlike the federal, assures "just compensation" in ways other than interest, since it provides for such elements of damage as loss of business goodwill. (§ 1263.510 et seq.) Again, we do not agree. The Legislature may choose to recompense the owner of property or a business for a variety of losses caused by exercise of the eminent domain power. Its choices, however, are not necessarily the measure of the "just" compensation constitutionally due. (See *Community Redevelopment Agency* v. *Abrams* (1975) 15 Cal.3d 813, 831-832 [126 Cal.Rptr. 473, 543 P.2d 905, 81 A.L.R.3d 174], cert. den. (1976) 429 U.S. 869 [50 L.Ed.2d 149, 97 S.Ct. 180].) A statute's provisions may exceed constitutional requirements in one area while failing to fulfill them in another. ■ Whatever other rights he has or lacks, a landowner is *constitutionally* entitled to compensation reasonable under market conditions for any lost use of money arising from a delay between the taking of his property and full payment.[12]

[11]As the Law Revision Commission observed in its 1960 Recommendation and Study Relating to Taking Possession and Passage of Title in Eminent Domain Proceedings, "[t]here is little, if any, disagreement over [the] policy [of accruing interest from the date of possession to the date of award], since all agree that if the property is physically taken, *the condemnee has for all practical purposes lost his property* and should be allowed legal interest until the time he is paid the award. . . ." (3 Cal. Law Revision Com. Rep. (1961) p. B-48, italics added.)

[12]This court has sometimes taken a skeptical view of the United States Supreme Court's suggestion that the landowner must be placed "in as good [a] position pecuniarily" as if he had not lost his land to eminent domain. (See, e.g., *Abrams, supra,* 15 Cal.3d at p. 827, fn. 9 ["[t]his language . . . makes up in idealism what it lacks in universal application"]; see also *County of Los Angeles* v. *Ortiz* (1971) 6 Cal.3d 141, 147 [98 Cal.Rptr. 454, 490 P.2d 1142, 68 A.L.R.3d 538].) However, *Kirby* leaves little doubt that the high court still adheres literally to that admonition for purposes of delayed-payment interest. We cannot conclude that our state Constitution accords any lesser right.

Plaintiff and its amici complain bitterly of the "unjust" cost to government of market-rate condemnation interest in periods when prevailing rates are high. But the difference between the deposit and the final award is nothing more than an involuntary purchase-money loan from the condemnee to the condemner. We cannot see how justice is served by restricting the condemnee, during times of high interest, to a "legal" rate which may be far below the rate the agency would have to pay in its usual financial markets for the same funds.

It is suggested that the "deposit increase" feature of the Eminent Domain Law is an adequate safeguard against efforts to make the condemnee an involuntary below-market lender. The statute declares that the condemner "or . . . any party having an interest in the property" may move at any time to increase the original deposit to a level which more accurately reflects probable value. (§ 1255.030.)

This provision may minimize the condemnee's involuntary financing burden, and it may discourage manipulation of the deposit amount by the condemner in inflationary times. However, it does not address the Constitution's requirement that the condemnee receive "just compensation" on any loan he *is* forced to make. However small the difference between deposit and award, the condemnee is constitutionally entitled to the monetary equivalent of that difference paid contemporaneously with the taking. (See authorities cited *supra*.) Constitutional equivalency, we must conclude, is measured by interest at the prevailing market rate.[13]

## II.

We have ruled that the just compensation clause is not necessarily satisfied when a rate of interest set by statute is applied as a ceiling in condemnation cases. We must therefore decide what formulas and procedures courts should apply in determining a constitutional rate of return when, as here, statutory guidelines are inadequate.

The Gilmores urge that the interest awarded should reflect their costs of borrowing funds necessary to secure replacement property. We disagree. The compensation constitutionally due is the "full and perfect" monetary

---

[13]During the entire periods for which interest is due in these cases, all relevant money-market rates substantially exceeded the legal rate of interest. Hence, we need not and do not decide whether the legal rate prevails when it is *higher* than the market rate (see, e.g., *U.S.* v. *329.73 Acres, Grenada and Yalobusha Ctys.* (5th Cir. 1983) 704 F.2d 800, 812; *Blankinship, supra,* 543 F.2d at p. 1276) or when there is no significant difference between the two (see, e.g., *Miller, supra,* 620 F.2d at p. 837; *Matter of City of New York, supra,* 449 N.E.2d at pp. 401-402; *Tucson Airport Authority* v. *Freilich* (1983) 136 Ariz. 280 [665 P.2d 1002, 1006]).

equivalent of the *fair market value of the condemned property,* paid contemporaneously with the taking. It does not include other losses or expenses which are merely consequential to displacement or relocation. (*Kimball Laundry Co.* v. *U. S.* (1949) 338 U.S. 1, 11-12 [93 L.Ed. 1765, 1775-1776, 69 S.Ct. 1434, 7 A.L.R.2d 1280]; *Abrams, supra,* 15 Cal.3d at pp. 818-832; *Ortiz, supra,* 6 Cal.3d at pp. 148-149.)[14]

The decisions generally concur that constitutionally acceptable interest on a condemnation payment which is delayed until after taking should bear some relationship to rates the *condemnee could have achieved by investing the funds* if they had been paid at the time of the taking. Beyond this, there is little consensus as to how, and by whom, that rate should be determined.

The majority of state and federal cases have indicated that, since interest is an element of just compensation, its calculation is a matter for the guided discretion of the trial court, case by case. A test often stated is the rate which would have been earned by " 'a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal.' " (*Washington Metro. Area T.A.* v. *One Parcel of Land* (4th Cir. 1983) 706 F.2d 1312, 1322; *429.59 Acres of Land, supra,* 612 F.2d at p. 465; *King, supra,* 467 A.2d at pp. 1038-1039; *Freilich, supra,* 665 P.2d at p. 1006; *Laurel, Inc.* v. *Commissioner of Transp.* (1980) 180 Conn. 11 [428 A.2d 789, 805]; *Carney, supra,* 309 N.W.2d at p. 776.)

Since a prudent investor would diversify his interest portfolio, some opinions suggest that the trial court should consider prevailing rates, during the period of delay, for investments of varying length and risk. Typically, these have included short, medium, and long-term government and corporate obligations. (E.g., *429.59 Acres of Land, supra,* 612 F.2d at p. 465; *United States* v. *319.46 Acres of Land More or Less* (W.D.Okla. 1981) 508 F.Supp. 288, 290.)

Theories of interest compensation are almost as numerous as the cases considering them. Some decisions declare that, since government is a low-risk debtor, the condemnee is entitled only to the rates at which the government borrows, not to those prevailing on higher-risk corporate investments. (E.g., *Blankinship, supra,* 543 F.2d at p. 1277.) Others say that the government's cost of borrowing, as such, cannot determine just compensation

---

[14]The *Legislature* has provided for payment to a displaced business owner of the expenses, up to $10,000, he incurs in finding and moving to a new location. (Gov. Code, § 7262.) It has also provided for payment to displaced *dwelling* owners, but not to businesses, of amounts up to $15,000 to compensate for any increased cost of a comparable replacement structure, for any increased interest cost on its purchase, and for other incidental expenses of closing the replacement purchase. (*Id.,* § 7263, subds. (a), (b).)

to the *condemnee*. (E.g., *Pitcairn* v. *United States* (Ct.Cl. 1976) 547 F.2d 1106, 1124, cert. den. (1978) 434 U.S. 1051 [54 L.Ed.2d 804, 98 S.Ct. 903]; see also *Georgia-Pacific Corp.* v. *United States* (Ct.Cl. 1980) 640 F.2d 328, 366.) Some authorities limit the relevant hypothetical investments to those whose terms are similar to the actual delay in payment, while others urge that the formula must account for diversification into obligations of varying lengths. (Compare, e.g., *429.59 Acres of Land, supra,* 612 F.2d at p. 465 ["it is proper to consider the rate of interest paid on different types of securities with different maturities"] with *Blankinship, supra,* 543 F.2d at p. 1276 ["government obligations having a duration approximating the period during which the deficiency was unpaid"].) One decision has indicated that, since the statutory rate is prima facie reasonable, it can be compared for constitutional purposes only with the prevailing rates during the period of delay on "stable" medium-term government investments. (*Matter of City of New York, supra,* 449 N.E.2d at pp. 401-402.)

The United States Court of Claims has stressed that case-by-case calculation at the trial level of just-compensation interest subverts the important principle of uniformity among litigants entitled to interest for the same time periods. Hence, that court has established, at the appellate level, binding rates applicable in all cases for particular calendar years. The rates are derived from trends revealed by Moody's Composite Index of Yields on Long Term Corporate Bonds. (*Miller, supra,* 620 F.2d at p. 840; *Tektronix, Inc.* v. *United States* (Ct.Cl. 1977) 552 F.2d 343, 352-353, cert. den. (1978) 439 U.S. 1048 [58 L.Ed.2d 707, 99 S.Ct. 724]; *Pitcairn, supra,* 547 F.2d at pp. 1120-1124.)

■ Absent specific statutory guidance, we are persuaded that the "prudent investor" principle is a sound basis for calculation of interest as just compensation. This doctrine seems best suited to give the condemnee the "full and perfect" monetary equivalent of a timely cash payment for his property, thus placing him "in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." (*Kirby, supra,* 467 U.S. at p. 10 [81 L.Ed.2d at p. 11].)

We have declared that the Constitution, in principle, prohibits government from forcing a condemnee to finance acquisition of his property at "a 'legal' rate which may be far below the rate the [acquiring] agency would have to pay in its usual financial markets for the same funds." (*Ante,* p. 802.) Despite its superficial appeal, however, we do not accept the view of some *federal* cases that the market rate payable should be geared exclusively to that at which the condemning agency could have borrowed the unpaid funds in its usual financial markets.

Proponents of this "government rate" approach argue that the condemnee should receive a rate commensurate with the low-risk debt obligation he actually holds. By the same token, they urge, government should not be forced to borrow from condemnees at rates above those it would normally pay.

Under the just compensation clause, the cost of a public enterprise must be distributed fairly between the displaced landowner and the taxpayers. Nonetheless, there are at least two difficulties with the government-rate analysis. In the first place, unpaid condemnation awards are *sui generis* and difficult to compare with other obligations of local agencies, such as bonds, in terms of risk, real rate of return, and the like.[15]

In the second place, one whose land was forcibly taken by a public agency on the basis of a deficient cash deposit is no "prudent investor" who has evaluated the risk and benefits of extending credit to the government for the balance due. Rather, he is an involuntary lender to a debtor he would often prefer not to have. For this reason, the risk of any difference between the rates the government would normally pay, and those the condemnee could have achieved by prudent participation in the broader market, should fall on the former. (Cf., *Miller, supra,* 620 F.2d at p. 839.)

This works no undue hardship on the agency. As we have seen, the Eminent Domain Law was not intended to make condemnees the unwilling financiers of public acquisitions. It directs an agency seeking early possession to deposit a realistic estimate of "probable compensation," based in most cases on an expert appraisal. (§ 1255.010, subds. (a), (b).) The condemnee may move to increase a deposit he considers inadequate. (§ 1255.030.) The obvious purpose is to get as close as possible to full value, thus minimizing the balance the condemnee is forced to carry pending trial and final judgment. If a government agency requires more cash for such realistic, good-faith deposits than its current revenues allow, it may seek those funds, at the rates normally applicable, in the markets designed to accommodate government borrowing.

---

[15]For example, one federal case has urged that the government's "irrevocable commitment" to pay the award in a quick-take case (see 40 U.S.C. §§ 258c, 258e) makes the debt "risk-free" and justifies a lower return rate. (*Blankinship, supra,* 543 F.2d at p. 1276.) Another, however, has suggested that an unpaid condemnation award is particularly unattractive as an investment, since, until final judgment, it is illiquid, uncertain in both amount and maturity. (*Miller, supra,* 620 F.2d at p. 839.) Interest on many local agency bonds is, of course, exempt from federal income tax (see 26 U.S.C. § 103(a)(1)), raising the real rate of return. Condemnation interest is not similarly exempt. On the other hand, bondholders must often rely on the general credit of the agency, while an unpaid condemnee has something akin to a security interest in the condemned property. If a final award remains unpaid after 30 days, the condemnee may obtain a dismissal of the proceedings and repossess the property. (§§ 1268.010, subd. (a), 1268.020, subd. (b).)

■ Determination of a constitutionally proper rate of interest, based on a comparison between the statutory rate and that a "prudent investor" might have achieved, must primarily be the task of trial rather than appellate courts. The Eminent Domain Law itself contemplates that calculation of interest is to occur at the trial level. (§ 1268.340.)[16] Moreover, the variables applicable to the money market are so numerous, and its structure so subject to change over time, that rigid appellate guidelines would be of little use. In general, the trial court should examine, at the condemnee's behest, the rates prevailing during the period a condemnation payment was delayed for all forms of money-market obligations, governmental and private, which prudent depositors and investors normally purchase for income purposes, and whose terms or maturities fall within the period of delay.[17]

Case-by-case calculation of prevailing-rate interest does add another burden to the trial court's already tedious condemnation responsibilities. It also permits the application of inconsistent rates to similarly situated condemnees. However, as prior decisions have observed, there is no need for trial of the interest issue to become the tail that wags the dog. Many published services track money-market trends with great precision and accuracy. Examples include the publications of Moody's Investors Service and the comprehensive monthly Federal Reserve Bulletin. Such documents are subject to judicial notice in the trial court's discretion. (See Evid. Code, § 452, subd. (h).)[18] The court may admit such expert testimony as will assist it in interpreting the published data, but testimony merely cumulative to the published information may be excluded. (*Id.,* § 352.)[19]

---

[16]Section 1268.340 provides that interest "shall be assessed by the court rather than by jury." This case does not present the issue whether withdrawal of the interest calculation from the jury violates the constitutional rule which permits a taking or damaging of private property for public use "only when *just compensation, ascertained by a jury unless waived,* has first been paid. . . ." (Cal. Const., art. I, § 19, italics added.)

[17]By the phrase "terms or maturities [which] fall within the period of delay," we mean to include shorter-term obligations which could have been "rolled over" by a prudent investor during the delay period. Of course, since interest is at issue, only the rates of return on interest-bearing obligations are relevant. No case has suggested that the Constitution contemplates a "prudent investor" in stocks or other equity securities.

[18]Subdivision (h) permits the court to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

[19]Just compensation is achieved if, for the entire period of delay, the actual total interest earned on the unpaid portion of the condemnation judgment was not substantially below that which a prudent investor of the funds would have earned during the same period. Thus, the trial court need not gear the interest award to week-by-week changes in prevailing market rates. It may divide the delay period into larger, more manageable segments, such as three- or six-month periods, determining an overall "blended" rate which would probably have been achieved during each. The court may also simplify its task by selecting several representative obligations, of varying term and risk, rather than tracking every conceivable interest-bearing instrument available on the market. (See *429.59 Acres of Land, supra,* 612 F.2d 459, 465; *319.46 Acres of Land More or Less, supra,* 508 F.Supp. at p. 290.)

Computations may vary somewhat from case to case, but that alone does not mean that any litigant has been denied just compensation. Valuation of the condemned parcel itself is a subjective and factual matter; the factfinder's decision, unless based on incorrect legal principles, is upheld if supported by substantial evidence. (See *City of Downey* v. *Royal* (1963) 215 Cal.App.2d 523, 530 [30 Cal.Rptr. 159].) Similar principles should apply in the case of interest. (*429.59 Acres of Land, supra,* 612 F.2d at p. 464 ["clearly erroneous" test].)

In any event, our cursory review of statistical data in the instant record suggests that the trends in the relevant money-market rates tend to parallel each other, and that the range between the lowest and the highest is rarely extreme.[20] Hence, we do not foresee gross disparities in the interest results reached by different trial courts for a particular time period.

Here, the trial court refused to consider defendants' prevailing-rate evidence because it considered itself absolutely bound by the statutory rate. We will therefore remand to the trial court for a determination what the constitutionally proper rate or rates of interest are for the period between taking and final payment in each of these cases.[21]

### III.

Howard and Frances Hudson filed a memorandum of costs and disbursements listing attorney's fees and appraisal fees as recoverable items. They also moved for recovery of those items as litigation expenses pursuant to section 1250.410, subdivision (b). Their motion was opposed by plaintiff, and plaintiff also moved for an order striking those items from the Hudsons' memorandum of costs and disbursements. The trial court denied the motion for litigation expenses and granted the motion to tax costs.

The Hudsons contend that those rulings were erroneous because the award was significantly higher than the highest offer made by plaintiff. The Hudsons rely on *County of Los Angeles* v. *Kranz* (1977) 65 Cal.App.3d 656

---

[20]For example, according to the Federal Reserve Bulletin, for the week ending January 29, 1982, rates on interest-bearing obligations of three years or less ranged from 12.28 percent for three-month T-bills in the secondary market to 14.65 percent for three-year Treasury notes. For the week ending February 26, 1982, the range was from 12.31 percent for secondary-market three-month T-bills to 14.32 percent for two-year Treasury notes.

[21]As the text notes, our discussion of judicial procedures for calculating adequate interest assumes that no legislative guidelines, based on prevailing market rates, have been adopted. Nothing in this opinion is intended to prevent the Legislature from enacting its own prevailing-rate formula. Nor need a legislative formula adhere strictly to that set forth in this opinion, so long as the general requirements of "just compensation" we have discussed are satisfied.

[135 Cal.Rptr. 473] and *Community Redevelopment Agency of Hawthorne v. Friedman* (1977) 76 Cal.App.3d 188 [143 Cal.Rptr. 160] in support of this contention. When the motions under review in *Kranz* and *Friedman* were ruled upon, recovery of a condemnee's litigation expenses was governed by former section 1249.3, which provided in pertinent part, "If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the condemnor was unreasonable and that the demand of the condemnee was reasonable, *all viewed in the light of the determination as to the value of the subject property,* the costs allowed pursuant to Section 1255 shall include all expenses reasonably and necessarily incurred in preparing for and in conducting the condemnation trial including, and not limited to, reasonable attorney's fees [and] appraisal fees. . . ." (Stats. 1974, ch. 1469, § 1, p. 3208, italics added.) Former section 1249.3 has been replaced by section 1250.410. When the motions to tax costs and to recover litigation expenses were made in the instant case, subdivision (b) of section 1250.410 provided as follows: "If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable *viewed in the light of the evidence admitted and the compensation awarded in the proceeding,* the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses. In determining the amount of such litigation expenses, the court shall consider any written revised or superseded offers and demands filed and served prior to or during trial." (Italics added.)[22] (Section 1235.140 defines "litigation expenses" as including attorney's fees and appraisal fees reasonably and necessarily incurred by the defendants.)

Thus, the mathematical relation between the plaintiff's highest offer and the award is but one factor to be considered by the trial court under the new statute. Section 1250.410 requires the court to evaluate the reasonableness of the plaintiff's offer in light of the award and the evidence adduced at trial. The trial court's determination of that issue is a resolution of a question of fact and will not be disturbed on appeal if supported by substantial evidence. (See *City of El Monte v. Ramirez* (1982) 128 Cal.App.3d 1005, 1009, 1014 [180 Cal.Rptr. 690].)

Although appellants have supplied us with a reporter's transcript of the hearing on the motions for recovery of litigation expenses and to tax costs,

---

[22]Section 1250.410, subdivision (b), now provides: "If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses. [¶] In determining the amount of such litigation expenses, the court shall consider the offer required to be made by the plaintiff pursuant to Section 7267.2 of the Government Code and any other written offers and demands filed and served prior to or during the trial."

the Hudsons have neglected to supply this court with a reporter's transcript of the trial. Since the reporter's transcript of the trial has not been provided, we must presume that the evidence adduced at trial supports the determination that plaintiff's offer was reasonable.

That portion of the judgment involving parcel 11 that awards the Hudsons interest at the legal rate is reversed and remanded for a determination of the constitutionally proper rate of interest, according to the principles set forth in this opinion, for the period between the taking of that parcel and final payment therefor. The judgment involving parcel 11 is otherwise affirmed. That portion of the judgment involving parcel 9 that awards the Gilmores and Strattan interest at the legal rate is reversed and remanded for a similar determination of constitutionally proper interest applicable to that parcel. The judgment involving parcel 9 is otherwise affirmed. The order granting the motion to tax costs is affirmed. The order denying the Hudsons' motion to recover litigation expenses is affirmed.

Kaus, J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I concur.

The majority abandon the statutory rate of interest in eminent domain taking, on a theory that the constitutional requirement of just compensation necessarily demands an interest rate higher than that arbitrarily established by law. I agree that the majority reach the proper result in today's inflationary economy.

Inflation, however is not an immutable fact of life. Economists tell us money and its value are subject to cyclical swings. As John Kenneth Galbraith wrote, "nothing, not even inflation, is permanent." (Galbraith, Money (1975) p. 3.)

If the statutory rate of interest does not apply when the market rate is higher, does it apply when the market rate dips below the figure prescribed by law? The majority, in footnote 13, deliberately sidestep that issue. Since we are declaring a new rule, I believe we have a duty to discuss its general applicability.

A condemnee is entitled to *just* compensation. (Cal. Const., art. I, § 19.) That means not *less* than the current market value of money. It also means not *more*. Indeed, to assess more than just compensation runs the risk of violating the prohibition against making a gift of public funds. (Art. XVI, § 6.)

Until recent United States Supreme Court decisions discussed in the majority opinion, it was assumed that the legal rate of interest was necessarily just compensation. Now that we are holding the statutory rate is no longer a valid determinant of the value of money, the rule that trial courts must ascertain the actual market value of money applies whether the current interest rate is higher or lower than the statutory figure. In other words, interest travels on a two-way street. Just as the value of the property to be condemned rises or falls in accordance with current economic conditions, so must the rate of interest to which the property owner is entitled.

With that understanding, I concur in the majority opinion.

Bird, C. J., and Agliano, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.