In re Robert Anthony ROSSI, Debtor.

In re Patricia Ann ROSSI, Debtor.

In re Eugene HESTER; Claudette Hester, Debtors.

Lawrence A. DIAMANT,
Trustee, Appellant,

v.

BANK OF A. LEVY, Appellee.

Richard J. TEJEDA and Louie W. Tejeda, Appellants,

v.

Lawrence A. DIAMANT,
Trustee Appellee.

BAP Nos. CC–87–1382 JVMe, CC–87–1428 JVMe.
Bankruptcy Nos. LA 85–00866 NCA, LA 85–09868 NCA and LA 85–00815 NCA.
Adv. No. LA 86–1571–NCA.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Oct. 28, 1987.

Decided April 28, 1988.

Michael D. Warner, Robinson, Wolas & Diamant, Los Angeles, Cal., for appellants.

Oswald A. Hunt, Tiffany, Hunt & Brown, Oxnard, Cal., K. Reed Harrison, Westlake Village, Cal., for appellees.

Before JONES, VOLINN and MEYERS, Bankruptcy Judges.

## OPINION

The Tejedas appeal the trial court's decision to award condemnation proceeds to the bankruptcy trustee rather than to the Tejedas. The trustee appeals the trial court's decision to award part of the condemnation proceeds to the Bank of A. Levy. We AFFIRM both decisions.

## FACTS

In December 1980, Robert and Patricia Rossi ("Debtors") purchased from Gilbert Levy five lots of real property ("the Oxnard Property"). A one-story brick building covers two of the lots; the remaining three lots, located at the rear of the building, make up an unimproved triangular parcel which was used as a parking lot. When the Debtors purchased the Oxnard Property it was encumbered by a promissory note secured by a first deed of trust in favor of the Bank of A. Levy ("Bank"). As security for the balance of their purchase price, the Debtors gave Gilbert Levy a second deed of trust covering the Oxnard Property.

In August, 1984 the Redevelopment Agency of the City of Oxnard ("the City") filed a complaint in the Ventura County Superior Court seeking condemnation of the rear parcel of the Oxnard Property, i.e., the unimproved triangular lot ("the Condemned Property"). The City intended to use the Condemned Property for the construction of the Oxnard Transportation Center. Pursuant to the applicable statutory condemnation provisions, the City also filed a notice of lis pendens, a summary of the basis for appraisal opinion, a deposit of probable just compensation in the sum of $160,000 and notice of deposit, and an order for prejudgment possession. The order for prejudgment possession authorized the City to enter upon and take immediate possession of the Condemned Property on or after November 20, 1984.

On January 23, 1985, Debtors filed separate Chapter 11 petitions. Both cases were later converted to Chapter 7 proceedings and the trustee was appointed.

On October 11, 1985, the Viola Construction Company began building a bus platform and canopy framework for the transportation center. The work extended over approximately a 12 week period and included the installation of electrical wiring, plumbing, canopy columns and pavement.

The Debtors' bankruptcy filings stayed the condemnation action, but on October 30, 1985, the City obtained relief from the automatic stay. The order granting relief to the City was conditioned upon the following: (a) that the City cause the probable just compensation of $160,000, previously deposited with the Clerk of the Ventura County Superior Court, to be paid to the trustee, to be held in trust for the benefit of the bankruptcy estates which he was administering and the creditors thereof; (b) that the City could proceed in the State Court only as to a determination that the sum of $160,000 was just compensation; (c) that any division of the just compensation be made pursuant to an order of the bankruptcy court.

Subsequently, Gilbert Levy, the beneficiary under the second deed of trust obtained relief from the stay to proceed with a foreclosure sale. The foreclosure sale was held on February 11, 1986. At that sale, the Tejedas purchased the Oxnard Property, exclusive of the Condemned Property and subject to the existing promissory note and first deed of trust in favor of the Bank, for $220,000:

On or about June 17, 1986, the Tejedas commenced an adversary proceeding against the trustee, the Bank and other interested parties. The thrust of the complaint was that, as purchasers of the Oxnard Property, the Tejedas were entitled to the condemnation proceeds which had been set aside as compensation for the taking of a portion of that property.

On January 2, 1987, the trustee filed a motion for summary judgment. At that time, only the trustee and the Bank remained as defendants claiming an interest in the condemnation proceeds. The trustee argued that, as a matter of law, he was entitled to the entire amount of the condemnation proceeds because the Debtors owned the Oxnard Property, including the Condemned Property, on the date of the "taking" by the City.

The parties have used the following figures for determining apportionment:

A. Original fair market value of Oxnard Property at time of Bank's original loan $133,000
B. Original purchase money loan from the Bank $100,000
C. Pretake fair market value of Oxnard Property $333,000
D. Remaining Balance on loan at time of condemnation $ 80,358 [1]

Argument on the Trustee's motion for summary judgment was heard on January 29, 1987 and an evidentiary hearing was held on January 30, 1987. On March 26, 1987 the Bankruptcy Court entered its Memorandum of Decision and Order. The court held that the trustee was entitled to the condemnation proceeds, but that the Bank was entitled to $38,009.35 as compensation for impairment of its lien and $6,550 in attorney's fees. The trustee timely appealed and the Tejedas timely cross-appealed.

## ISSUES

A. In appeal no. CC 87–1428, the issue is whether the right to receive the condemnation proceeds accrued when the city entered on the Condemned Property and began work on the transportation center.

B. In appeal no. CC 87–1382, the issues are whether the trial court erred in (1) concluding that the Bank's security interest was impaired by the condemnation, and (2) in computing the amount of the award to the Bank.

1. The trial court made factual findings for the latter two amounts ($338,000 and $80,358 respectively). There appears to be no dispute

## STANDARD OF REVIEW

Normally, we review a grant of summary judgment de novo. *See In re Schuman*, 81 B.R. 583, 585 (9th Cir. BAP 1987). Here, however, the court held a lengthy evidentiary hearing and issued a memorandum of decision which specifically states that it constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Therefore, we review the bankruptcy court's findings of fact under the clearly erroneous standard, Bankr.Rule 8013, and its conclusions of law under the de novo standard. *See Trustees of the Amalgamated Ins. Fund v. Geltman Ind., Inc.*, 784 F.2d 926, 929 (9th Cir.1986). When a "taking" occurs is a question of law. Whether a lienholder's security is impaired and by how much are questions of fact. *See People ex. rel. Dept. of Transp. v. Redwood Baseline Ltd.*, 84 Cal.App.3d 662, 149 Cal.Rptr. 11, 28 (1978).

## DISCUSSION

### A. *When the "taking" occurred*

The trial court concluded that the Condemned Property was "taken" when the City took possession of the property and started building the transportation center. Because that event occurred prior to the foreclosure sale, the court held that the bankruptcy trustee, rather than the Tejedas, was entitled to the condemnation proceeds.

The Tejedas argue that the trial court erred in awarding the condemnation proceeds to the bankruptcy trustee. We disagree. The Tejedas' first argument is as follows: (1) They obtained title to the Condemned Property at the foreclosure sale; (2) under California law, title passes to the condemnor only when the final judgment in the condemnation action is entered (*see Brick v. Cazaux*, 9 Cal.2d 549, 71 P.2d 588 (1937); Cal.Civ.Proc.Code § 1253); (3) because the final judgment of condemnation was entered after the foreclosure sale,

regarding the former two figures and, for purposes of this decision, we will assume they are accurate.

the Tejedas are entitled to the condemnation proceeds.

■ Although the premises of this argument are correct, we disagree with its conclusion because the date that title passes does not determine who is entitled to compensation. Rather, compensation for the taking goes to the party who owns the property at the time it was taken. *See People ex. rel. Dept. of Public Works v. Fink*, 226 Cal.App.2d 19, 37 Cal.Rptr. 724 (1964); *People v. Joerger*, 12 Cal.App.2d 665, 668, 55 P.2d 1269 (1936). *Joerger* is the California case most similar to the case at bar. There, the State of California commenced condemnation proceedings against property owned by the Joergers. The state paid a deposit into the court, obtained an order for immediate possession, then entered on the property and commenced construction of a freeway. Subsequently, a bank holding a first deed of trust on the condemned property commenced a foreclosure proceeding and purchased the property at a trustee's sale. Later, a final decree of condemnation was entered and the full amount of the condemnation order was paid into the court. Both the Joergers and the bank claimed the condemnation award. The trial court awarded the condemnation proceeds to the bank. On appeal, the California Court of Appeal reversed. The court stated:

> It is undoubtedly the rule that "compensation in general must be paid to the person who owns the property at the time it was taken or injured." 20 C.J. p. 847, § 286. It follows that if entry into possession by plaintiff under the order mentioned, and the various acts of ownership performed by plaintiff constitute a "taking," then appellants were entitled to the compensation. Our Supreme Court has decided very definitely that the act of the state in entering into possession of the property and proceeding to construct the highway was a "taking" of the property as that term is used in the provisions of the Constitution above quoted.

> .    .    .    .    .

> These [California] cases follow the general rule. "It may be stated as a general rule that there is a taking where the grantee of the power of eminent domain enters upon the land, not for the mere purpose of examination or survey, and does some act evidencing an intention to appropriate it." 20 C.J., p. 723 § 182. The evidence of an intent upon the part of the plaintiff in the instant case to "appropriate" the property of appellants is overwhelming and beyond dispute.

*Joerger*, 55 P.2d at 1271. *See People ex rel. Dept. of Public Works v. Peninsula Title Guar. Co.*, 47 Cal.2d 29, 301 P.2d 1, 3–4 (1956); *People v. Watkins*, 175 Cal. App.2d 182, 345 P.2d 960, 964–65 (1959).

The facts in the case at bar closely parallel the facts in *Joerger*. Here, the condemnation proceeding was commenced while the Rossis owned the property. The city paid a deposit into the court registry and obtained an order of immediate possession. The city then commenced construction of the transportation center. Subsequently, the property was sold and the Tejedas purchased it. Under *Joerger*, there was in the instant case a "taking" while the Rossis still owned the property. As a result, the Rossis, or rather their bankruptcy estate, are entitled to the condemnation proceeds.

The Tejedas argue that *Joerger* is distinguishable because the amount of work performed by the City here was less than that performed by the state in *Joerger*. We disagree. In *Joerger*, "the physical character of the land was so changed that it would have been impossible to restore said land to its original condition." 55 P.2d at 1270. Here, however, the Tejedas argue that one day's work could have restored the Condemned Property to its original condition. We find this distinction irrelevant. *Joerger* does not require that irreparable damage occur in order to have a taking. Rather, the question is whether the condemning agency has done some act evidencing an intention to appropriate the property. *See Peninsula Title Guar. Co.*, 301 P.2d at 4 ("There is no justifiation for a holding that the test of a 'taking' is whether the lands thereafter may be restored to their original condition."). The acts done

by the city in the case at bar clearly evidence the city's intent to take the property. We therefore decline to distinguish *Joerger* on the basis of a lesser amount of work having been done.

The Tejedas further argue that *Joerger* is no longer good law because the California Condemnation Statutes were amended in 1963. Although the statutes were amended in 1963 [2], we disagree that *Joerger* is no longer good law. Both the Ninth Circuit Court of Appeals and the California Supreme Court have reaffirmed the validity of *Joerger*. *See Milens of Cal. v. Richmond Redev. Agency,* 665 F.2d 906, 909–910 (9th Cir.1982); *Redev. Agency v. Gilmore,* 38 Cal.3d 790, 700 P.2d 794, 214 Cal.Rptr. 904 (1985); *City of Los Angeles v. Ricards,* 10 Cal.3d 385, 515 P.2d 585, 110 Cal.Rptr. 489, 587 (1973). In *Gilmore,* the court stated that, "the California statutes themselves suggest an assumption that a constitutional 'taking' occurs no later than the moment at which the public agency obtains the right of early possession." 214 Cal.Rptr. at 912, 700 P.2d at 800. Accordingly, the court concluded that "except for defenses to the exercise of eminent domain, a landowner in California is permanently deprived of all of his rights in property sought by a public agency when the agency exercises its option to deposit estimated value and obtain early possession for the intended public use. We conclude, therefore, that a constitutional 'taking' occurs at this time." *Id.* (footnote omitted).[3] The principles announced in *Joerger* therefore remain good law in California.

The Tejedas cite *People v. Watkins,* 175 Cal.App.2d 182, 345 P.2d 960 (1959), for the proposition that a taking does not occur until the final order of condemnation is entered. The Tejedas' reliance upon *Watkins* is misplaced in two respects. First, in *Watkins,* the court issued an order of immediate possession, but the government agency "did not at any time take physical possession of the offending premises." 345 P.2d at 964. Thus, *Watkins* is distinguishable from the case at bar. Second, the *Watkins* court cited *Joerger* with approval and concluded that when there *is* a physical taking prior to entry of the final order, a "taking" occurs at that time; but when there is *no* physical taking prior to entry of the final order, a "taking" occurs when the final order is entered. Thus, *even* if *Watkins* was on point, it would not support the Tejeda's position.

The Tejedas further argue that they are entitled to the condemnation proceeds because they purchased the property while condemnation proceedings were pending. The Tejedas rely on *Brick v. Cazaux* which provides that "where property is purchased which is subject to pending condemnation proceedings and the deed conveying said property is silent as to the award money to be paid in the proceedings, said money belongs to and is payable to the purchaser." 71 P.2d at 590. *See also Security Co. v. Rice,* 215 Cal. 263, 9 P.2d 817 (1932). Neither *Brick* nor *Rice,* however, involved a taking prior to entry of the final order of condemnation. They therefore do not address when a taking occurs when an order for immediate possession is obtained. These cases are distinguishable from the case at bar on that basis.

In sum, we conclude that under California law, when a condemning agency obtains an order of immediate possession, and takes possession of the subject property,

2. Cal.Civ.Proc.Code § 1253 was amended to read: "The title to the property described in the final order of condemnation vests in the plaintiff for the purposes described therein upon the date that a certified copy of the <u>final order of condemnation</u> is <u>recorded in the office of the recorder</u> of the county." (The underscored material was added.)

3. The Tejedas argue that *Gilmore* is distinguishable from the case at bar because the *Gilmore* court determined when a taking occurred for purposes of deciding when interest began to accrue. Although the purpose for determining when a taking occurs was different in *Gilmore,* the California Supreme Court's conclusion about when a taking occurs was not dicta in that case. The outcome of the case, i.e., how much interest would be paid, depended upon the court's conclusion regarding when a taking occurred. The Tejedas cite no valid reason why a distinction should be made regarding when a taking occurs in *Gilmore* and in the instant case. Therefore, Gilmore is not distinguishable with respect to the proposition of law relevant here.

and evidences an intent to appropriate the property, the "taking" occurs at that time. Accordingly, the party who owned the property at that time is entitled to the condemnation award. In the case at bar, therefore, the bankruptcy trustee was properly awarded the condemnation proceeds paid into the court by the city.

■ Finally, the Tejedas argue that the bankruptcy trustee should be estopped from claiming the condemnation proceeds because of representations made by the trustee under the deed of trust. The Tejedas assert that the trustee under the deed of trust is the agent of the bankruptcy trustee and that the alleged misrepresentations made by that person should be imputed to the bankruptcy trustee. The Tejedas claim that the trustee under a deed of trust is "the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow...." *Kerivan v. Title Ins. & Trust Company*, 147 Cal.App.3d 225, 229, 195 Cal.Rptr. 53 (1983); *Woodworth v. Redwood Empire Savings & Loan Ass'n*, 22 Cal.App.3d 347, 366, 99 Cal.Rptr. 373 (1971). This, however, does not justify imputing statements allegedly made by the trustee under the deed of trust to the bankruptcy trustee. As a policy matter, attributing such statements to the bankruptcy trustee would frustrate the Bankruptcy Code's policy of allowing the trustee to dispose of estate assets. Moreover, the record clearly indicates that the bankruptcy trustee had no actual knowledge of the alleged statements by the trustee under the deed of trust.

Further, the record does not support a finding that the alleged statements were inaccurate or misrepresentations. Mr. Tejeda states in his declaration and opposition to the motion for summary judgment that "On the day before the trustee's sale and on the day of the trustee's sale the trust officer who conducted the sale assured me that I would be purchasing [all of the Oxnard Property]." At the foreclosure sale, the Tejedas were purchasing all of the Oxnard Property because the final order of condemnation had not yet been entered. However, long before the foreclosure sale, the City had recorded a notice of lis pendens indicating that the property was subject to condemnation proceedings. In addition, the record indicates that the Tejedas had viewed the property and seen the construction on the back lots of the property. The record further indicates that the Tejedas' offers to purchase the property prior to the foreclosure sale were only for the part of the property on which stood the building. They did not include the area behind the building where the transportation center was to be built. The record indicates that the Tejedas were on both actual and constructive notice that the Oxnard Property was subject to condemnation proceedings. As a result, they either knew or should have known that part of the Oxnard Property was subject to condemnation proceedings and that they might not be entitled to any subsequent condemnation award.

### B. *Impairment of the lien and division of the condemnation award.*

"[I]t is well settled in California that in the absence of an agreement between the parties to the contrary, a trust deed holder ... is entitled to share in an award resulting from condemnation of part of the property constituting the security only to the extent the security has been impaired by the taking." *People Ex. Rel. Dep't of Transp. v. Redwood Baseline, Ltd.*, 84 Cal.App.3d 662, 149 Cal.Rptr. 11, 16 (1978). The *Redwood Baseline* court discussed five rules for determining an impairment of security then stated:

> while each of these rules may be appropriate, helpful or even decisive in certain circumstances, no one of these rules may be appropriately applied to produce a fair result in all cases; and that, accordingly, the question whether the security of a deed of trust has been impaired by a partial taking should be treated as a question of fact to be determined in light of the particular circumstances of each case after a consideration of all of the relevant factors.

149 Cal.Rptr. at 16. The *Redwood Baseline* court later noted, however, that the pre-take ratio rule is the preferred rule.

149 Cal.Rptr. at 27 ("We agree that the pre-take ratio rule will achieve an equitable result in many cases. Additionally, we think it probable this rule more nearly accords with the bargain and reasonable expectations of the parties than any of the others suggested."). The court further noted that the pre-take ratio rule was preferred by commentators, 149 Cal.Rptr. at 26, and that the pre-take ratio rule is "now prescribed by statute for use in allocating a condemnation award result from a partial taking as between junior and senior lienholders in certain circumstances." *Id.*, 149 Cal.Rptr. at 27 (citing Cal.Civ.Proc.Code § 1265.230). The court then made a lengthy list of factors to be considered in determining whether a lien is impaired and which rule would best redress the impairment. 149 Cal.Rptr. at 28.

■ The trial court here concluded that the Bank's interest was impaired by the condemnation and that the Bank was entitled to share in the condemnation proceeds. The court further determined that it should apply the "pretake ratio rule" because "it achieves the most equitable result in light of the particular circumstances." Applying that rule, the court determined that the Bank's impairment entitled it to receive $38,009.35 plus $6,550 in attorney's fees and costs. The estate would retain $115,314.17 of the condemnation award.

The trustee argues that the Bank's lien was not impaired and that it was entitled to no proceeds of the eminent domain proceeding. The basis for this argument is that the Bank's "equity cushion" is substantially larger now (54%), with a security interest in only the non-condemned portion of the Oxnard Property, than it was when the loan originated (25%). According to the trustee, therefore, the Bank's lien was not impaired by the condemnation of a portion of the property it held as security, and the trial court should not have awarded any of the condemnation proceeds to the Bank.

The trustee does not review the factors cited by the *Redwood Baseline* court, nor does he argue that they suggest the court erred in using the pre-take ratio rule. The trustee simply points to the value of the property at the time of the original loan and the value at the time of the taking and asserts that the trial court erred. The appellant bears the burden of showing affirmative error on the part of the trial court. *Redwood Baseline*, 149 Cal.Rptr. at 29. In our view, the trustee has failed to satisfy this burden. Accordingly, the trial court's decision regarding apportionment of the condemnation proceeds is AFFIRMED.